**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------------------x
MACKENZIE SMITH,                                 :
MICHAEL SMITH, ROBERT CLENDANIEL,                :
MATTHIAS WAGMAN, and RHODA SMITH                 :
individually, and on behalf of all others similarly :
situated,                                        :
                          Plaintiffs,            :        CLASS ACTION
                                                 :
                                                 :        NO. _____
             v.                                  :
                                                 :
                                                 :        JURY TRIAL DEMANDED
THE CITY OF PHILADELPHIA,                         :
                                                 :
                          Defendant.             :
-------------------------------------------------------------x
```

**COMPLAINT**

1.      Plaintiffs Mackenzie Smith, Michael Smith, Robert Clendaniel, Matthias Wagman, and Rhoda Smith ("Plaintiffs") bring this action against the City of Philadelphia ("the "City" or "Defendant") for violations of their civil rights and the rights of the class members under the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. §1983.  Plaintiffs seek money damages and declaratory and injunctive relief on behalf of themselves and the class.

**INTRODUCTION**

2.      The City has a patchwork of practices, policies, and procedures, written and unwritten, which collectively authorize the City, its agents, and employees, to relocate private vehicles legally parked on the City's streets without prior or post-tow notice to the vehicle's owner or operator. The City refers to this practice and policy as "vehicle relocation." The practice is also referred to as "courtesy towing" by the news media, the public, and certain City

employees. (For the purpose of this Complaint, the City's practice of courtesy towing or relocating vehicles, and the patchwork of policies that allows this, will be referred to as the "Relocation Program," and the terms "courtesy tow" and "vehicle relocation" will be used interchangeably).

3.      Under the Relocation Program, the City and its agents tow cars to arbitrary spots at considerable distances from their original locations, unbeknownst to the vehicle's owner or operator. These secondary locations are often illegal, metered, or timed parking spots. This means that after a courtesy tow, vehicle owners and operators receive no notice or information on the new location of their car and accrue tickets and parking fines through no fault of their own. The Relocation Program currently has no mechanism in place to provide notice to vehicle owners and operators after a courtesy tow or to ensure that tickets and fines are not assessed against them.

4.      The City moves vehicles at its convenience and leaves it to vehicle owners and operators to deal with the consequences. By failing to provide vehicle owners and operators adequate notice or fair and adequate procedures for finding their vehicles, the Relocation Program unreasonably and arbitrarily deprived Plaintiffs and the class members of their possessory interests in the access to and use of their vehicles under the Fourth Amendment and without due process as required by the Fourteenth Amendment.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. §§ 1981, 1983, and 1988.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), because the Defendant is in this district, and the acts and occurrences giving rise to the claims took place in this district.

## PARTIES

7.      Plaintiff Mackenzie Smith ("Plaintiff Mackenzie Smith") is a resident of Pennsylvania. She is Plaintiff Michael Smith's daughter.

8.      Plaintiff Michael Smith ("Plaintiff Michael Smith") is a resident of Pennsylvania. He is Plaintiff Mackenzie Smith's father.

9.      Plaintiff Robert Clendaniel ("Plaintiff Clendaniel") is a resident of Pennsylvania.

10.     Plaintiff Matthias Wagman ("Plaintiff Wagman") is a resident of Pennsylvania.

11.     Plaintiff Rhoda Smith ("Plaintiff Smith") is a resident of Pennsylvania and Florida.

12.     Defendant is a Pennsylvania municipal entity capable of being sued under Pennsylvania law.  At all times relevant hereto, the decisions and actions complained of herein were made by the agents of the City pursuant to the City's official and unofficial policies or practices.

13.     The Philadelphia Police Department ("PPD"), a law enforcement agency, is an agency of the City charged with enforcing state and City laws. The City of Philadelphia is the legal entity responsible for the PPD. With respect to the policies, practices, and customs enabling the Relocation Program, the City has acted by and through the PPD and its employees as its duly authorized agents acting within the scope and course of their duties and employment and under the color of state law.

**FACTS**

14.     The City generally initiates vehicle relocations through PPD on streets where there are block parties, public gatherings, or street work, including but not limited to construction, repairs, or emergency maintenance. In those circumstances, PPD authorizes its agents, including the PPD tow squad, the Philadelphia Parking Authority ("PPA"), [1] and private tow companies under contract with the City, to relocate vehicles legally parked on those streets. Occasionally, on its own, or at the request of individual residents or other City departments,[2] PPD issues temporary "no parking" signs to post in these areas, informing drivers not to park there. But these signs provide no notice to vehicle owners who were previously parked there that their vehicles were towed or where. The signs provide no phone number, website, or other information, which could facilitate locating the towed vehicles. Additionally, the City does not monitor where these signs are posted or if they are posted at all.

15.     There is no formal policy or procedure requiring a tower to relocate a vehicle to a designated lot or parking space. Informally, relocated vehicles are supposed to be moved to legal parking spots a short distance from where they were originally parked. But the City does not enforce this rule, and, as a matter of practice and custom, vehicles are usually relocated to illegal, metered, or timed spots at significant distances from their original locations.

16.     The City takes no action to alert PPA not to ticket or impound a vehicle that has been relocated to a metered or zoned spot. For example, the City does not bother to leave documentation on relocated vehicles warning PPA against ticketing them.

---

[1] The Philadelphia Parking Authority is an agency of the Commonwealth of Pennsylvania independent from the City of Philadelphia. But the City of Philadelphia uses its services to carry out vehicle relocations pursuant to the Relocation Program.
[2] These departments include but are not limited to the City's Streets Department, Water Department, and Department of Licenses & Inspections.

17.    As a result, vehicle owners are not only unable to find their cars after courtesy tows, but also responsible for paying tickets and fines they have accrued through no fault of their own.

18.    By and large, victims of vehicle relocations are unable to effectively challenge their tickets or fines because they cannot document or prove in writing that their tickets or fines resulted from a courtesy tow. This is because the City does not adequately track or record vehicle relocations or provide vehicle owners and operators with any information related to their courtesy tows.

19.    The Relocation Program provides no pre or post-tow notice to vehicle owners, even though the City can readily determine a vehicle owner's address to notify the owner of a tow simply by looking up a vehicle's license plate. The Relocation Program also provides no notice to vehicle owners, even though there is already such a protocol in place for notifying vehicle owners whose cars have been impounded for City Code violations. [3] This protocol could easily be applied to courtesy tows.

20.    There is no City department or employee responsible for maintaining records or a centralized repository related to vehicle relocations. There is no reason this should be the case. The City's Streets Department and Department of Licenses and Inspections track permitting and other street closure-related operations. Yet the City chooses not to assign these departments (or any department) responsibility for tracking vehicle relocations, which are often the result of street closures permitted by these departments.

---

[3] The City impounds private vehicles parked on City streets for specific infractions enumerated in the City Code. Procedures for notifying vehicle owners of their impounded vehicles include a publicly accessible database to assist them in locating and recovering their vehicles. The City does not provide any similar procedures for the Relocation Program.

21.     The Relocation Program does not require that notice be posted at a vehicle's original parking location, advising owners and operators where their cars have been taken or how to find them.

22.     The only information about how to retrieve a vehicle after it has been courtesy towed is on a page buried several levels down on the City's website, which suggests only that a call be made to the PPD district where the vehicle was originally parked.[4]

23.     Despite the webpage guidance, there is no City training or directive for PPD about what to tell vehicle owners and operators who call about courtesy tows. At times, PPD contacts the PPD tow squad to check if a vehicle is listed on the PPD "tow log." The tow log, updated infrequently by the PPD radio unit and the PPD tow squad, is an inaccurate and incomplete record of all vehicle tows initiated by PPD, including tows carried out by PPD, PPA, and private tow operators. The tow log has no real oversight and, more often than not, fails to list vehicles that have been relocated.

24.     The tow log is also problematic because the PPD radio unit, which frequently takes calls from vehicle owners and operators about relocations, does not track reports of courtesy tows because it is overburdened with 911 emergency calls. As a result, information

---

[4] The following appears on the City's website for those who can find it and is generally inaccurate, given that relocated vehicles are often ticketed or impounded:

> In some cases, the Philadelphia Police Department will relocate cars without ticketing or impounding them. Your car may get relocated if it is parked in a Temporary No Stopping area. If you believe your car has been relocated, call the police district of the area where your car was parked.
>
> • **Find my police district**

"Get Your Car Back When It Has Been Towed," City of Philadelphia, https://www.phila.gov/services/streets-sidewalks-alleys/get-your-car-back-when-it-has-been-towed/ (last accessed December 12, 2022).

about these vehicles is not entered into or cross-referenced with the tow log. The City is aware of this problem but has done nothing to correct it.

25.    Similarly, after completing a courtesy tow at the direction of PPD, private tow operators are supposed to fill out a paper sheet, indicating the license plate, make, and model of the vehicle, and the locations from where and to where the vehicle was towed. They are then supposed to deliver this sheet to the police district where the tow occurred, so that PPD can update the tow log accordingly. However, there are no designated PPD officers to ensure these sheets are completed correctly or even turned in, and information about these tows often does not make it into the PPD tow log.

26.    As a result, PPD are usually unable to locate courtesy towed vehicles in the tow log when asked about them. When this happens, PPD encourages vehicle owners and operators to report their cars as stolen even when they are not.

27.    At times, vehicle owners and operators find their relocated vehicles after reporting them stolen. Even if those vehicle owners and operators inform PPD that they have found their vehicles, due to lack of protocols, training, and supervision, PPD frequently fails to remove the found vehicle from the stolen vehicle database, causing the vehicle owners and operators to later be stopped, detained, or arrested by police for driving their own "stolen" cars, some at gunpoint.

28.    The City has failed to implement and utilize reasonably practicable procedures to notify owners that their vehicles have been towed and where. The City declines to use the mechanisms already available and in place for impoundments; fails to train PPD officers, the PPD tow squad, or the radio unit on how to assist vehicle owners and operators; and neglects to

oversee and maintain the PPD tow log for accuracy and correctness. As a result, the onus falls on vehicle owners and operators to search the City for their vehicles and pay any resulting fines.

29.     As a result of the City's policies, practices, and procedures, Plaintiffs and the class members have suffered an unlawful interference with their Fourth Amendment possessory rights in their vehicles and have been deprived of adequate post-deprivation process in violation of the Due Process Clause of the Fourteenth Amendment.

30.     The constitutional violations alleged in this Complaint are ongoing, and without judicial relief will cause harm to the class members who will be subjected to the Relocation Program.

31.     Plaintiffs and the class members have also been deprived of the use of their vehicles; incurred fees and fines from parking violations and impoundments resulting from their courtesy tows; loss of income from time missed from work spent searching for their vehicles; and expenses related to car services and rentals used while they were unable to locate their vehicles.

**Plaintiffs Mackenzie and Michael Smith**

32.     Plaintiff Mackenzie Smith is an intensive care unit nurse who requires a car to get to work. She frequently drove to her job in her 2013 Honda Civic (the "Honda Civic") from her home in the Fairmount section of Philadelphia. At all times relevant to this Complaint, Plaintiff Mackenzie Smith was the sole operator of the Honda Civic and an authorized driver under the car's insurance policy. Her father, Plaintiff Michael Smith, gifted her the vehicle but remained its registered owner.

33.     In or around March 2022, Plaintiff Mackenzie Smith drove home from work and parked the Honda Civic in a legal parking spot with no time limitations at the intersection of Corinthian and Poplar Streets near her home.

34.     Approximately one week later, she returned to that location to use her vehicle but found it was not there.

35.     Plaintiff Mackenzie Smith assumed her vehicle had been courtesy towed. She contacted Plaintiff Michael Smith for advice about retrieving the vehicle. Plaintiff Michael Smith suggested she contact the police.

36.     Plaintiff Mackenzie Smith called the Ninth Police District. She spoke to an officer (name unknown), who told her there was no record that her vehicle had been towed. He advised her to search for her car within a two-block radius of the original parking spot because that was where vehicles were usually relocated.

37.     Plaintiff Mackenzie Smith searched for her car for approximately an hour and a half within a four to five-block radius of the original parking spot but could not find it. She also contacted three local private towing companies to see if they had towed her vehicle. Each towing company told her they had no record of the tow.

38.     Plaintiff Mackenzie Smith again contacted the Ninth Police District for assistance. An officer (name unknown) arrived and completed a stolen vehicle report. The officer did not give her a copy of it but wrote the district control number on a scrap of paper and left it with her.

39.     In or around late March 2022, now believing the Honda Civic was stolen, Plaintiffs Mackenzie and Michael Smith reported the theft to their insurance company. During this time, Plaintiff Mackenzie Smith paid for car rental and ride services to travel to and from work.

40.    On March 30, 2022, Plaintiff Michael Smith purchased a used Subaru Forrester for Plaintiff Mackenzie Smith.

41.    On March 31, 2022, the insurance company processed the claim for the stolen Honda Civic. The amount reimbursed to the family for the stolen vehicle did not fully cover the cost of the Subaru Forrester.

42.    On April 18, 2022, Plaintiff Mackenzie Smith visited her mother and Plaintiff Michael Smith at their home in Phoenixville, Pennsylvania. She checked her phone and saw that she had received a voicemail from a PPD Officer Morton. He told her that the Honda Civic had been found at 800 N. 23rd Street, (a third of a mile from where she had originally parked it), with multiple tickets on the windshield. He explained that she had fifteen minutes to reclaim the vehicle before it was towed.

43.    Plaintiff Mackenzie Smith immediately called Officer Morton and explained that she could not get to the vehicle in fifteen minutes because she was in Phoenixville. Despite the situation, Officer Morton authorized the tow of the Honda Civic, and PT&T Towing, a private towing company, moved the vehicle to a lot at 3200 S. 61st Street.

44.    Plaintiff Michael Smith called the family's insurance agent and told him that the Honda Civic had been found. The insurance agent informed him that because the vehicle was now the property of the insurance company, the family could not go to the private tow lot to recover it or remove any personal belongings from it. The family was also not allowed to collect the parking tickets on the windshield of the car.

45.    In the months that followed, Plaintiff Michael Smith began receiving letters from the Philadelphia Parking Violations Branch, notifying him that he was delinquent in paying the hundreds of dollars' worth of parking tickets on the Honda Civic, even though he had no way of

retrieving them. The letter indicated that the tickets were for parking in a two-hour zone, parking in a school zone, and for an expired inspection. During the near month that the vehicle had been relocated, the vehicle's inspection had expired unbeknownst to Plaintiff Mackenzie Smith, who always kept the inspection current.

46.     In or around May 2022, Plaintiff Michael Smith began appealing the parking tickets that had resulted from the courtesy tow. During that month, Plaintiff Mackenzie Smith and her mother called the Ninth Police District and requested the stolen vehicle report to submit in connection with the ticket appeals. The Ninth Police District told them to come to the Ninth Police District's office for a copy.

47.     Plaintiff Mackenzie Smith and her mother went to the office. An officer (name unknown) informed them that the Ninth Police District did not have the stolen vehicle report, and that they should go to City Hall and request it from the Department of Records.

48.     Plaintiff Mackenzie Smith's mother went to City Hall and was unable to obtain a copy of the stolen vehicle report.

49.     Plaintiff Michael Smith's appeals of the parking tickets from the courtesy tow were denied, and he paid the tickets.

### Plaintiff Robert Clendaniel

50.     On October 30, 2022, Plaintiff Clendaniel parked his 2009 Pontiac Vibe at 1014 Pine Street near his apartment. He has a Zone 4 parking permit, allowing him to park on that City block for any unlimited period of time. At all times relevant to this Complaint, Plaintiff Clendaniel has been the registered owner and sole operator of his vehicle.

51.     On November 1, 2022, Plaintiff Clendaniel checked on his car, and it was still where he had parked it.

52.     On November 5, 2022, Plaintiff Clendaniel went to use his car and found that it was not there. Assuming the car had been courtesy towed, he walked to the PPD station at 905 South Street to see if there was a record of his vehicle's relocation.

53.     At the station, an Officer Devlin confirmed that his car had probably been relocated. Officer Devlin called the Sixth Police District and the PPD tow squad to see if there was any record of the tow. Neither the Sixth Police District nor the PPD tow squad had a record of it. As a result, Officer Devlin told Plaintiff Clendaniel to search for his vehicle within a five-block radius of where it had originally been parked. He told Plaintiff Clendaniel to call 911 in a few hours to report it stolen if he had not found it.

54.     Plaintiff Clendaniel returned to the 1000 block of Pine Street and asked the owners of the shops lining the block if they had seen any cars towed that day. The shop owners confirmed they had seen several cars towed because of City Water Department work.

55.     Per Officer Devlin's suggestion, Plaintiff Clendaniel searched for his car for approximately two hours. Unable to find it, he called 911 to report it stolen. An officer (name unknown) told him a squad car would come to his home for a stolen car report. Plaintiff Clendaniel waited approximately an hour and a half, but no squad car arrived.

56.     Plaintiff Clendaniel then called the Sixth Police District and asked if his vehicle had been courtesy towed. The Sixth Police District checked with the PPD tow squad and told him there was no such record. The Sixth Police District assured him that an officer would come out to Plaintiff Clendaniel for a stolen car report.

57.     Approximately twenty minutes later, a PPD officer (name unknown) arrived. He told Plaintiff Clendaniel his car had likely been relocated and contacted the PPD tow squad, who again had no record of the tow. The officer told Plaintiff Clendaniel that even though his car had

{00235045 }                                    12

been relocated, he would have to report it stolen. Plaintiff Clendaniel did. The officer did not provide Plaintiff Clendaniel with a copy of the stolen vehicle report. Before leaving, the officer encouraged Plaintiff Clendaniel to look for his car on "Columbus or Front Streets" because "that's where [relocated] cars end up a lot."

58.     On November 7, 2022, Plaintiff Clendaniel searched the City for his car but could not find it.

59.     On November 8, 2022, Plaintiff Clendaniel filed a stolen car claim with his insurance company.

60.     On November 10, 2022, a PPD Detective Hammond ("Detective Hammond") called Plaintiff Clendaniel and told him that his car had been found on the 1400 Block of Water Street in the Pennsport section of Philadelphia over a mile from where it was originally parked. Even though it was the middle of a workday, Plaintiff Clendaniel immediately called a ride service to go to his car.

61.     Upon arriving at the 1400 block of Water Street, Plaintiff Clendaniel was unable to locate his vehicle. He walked around the neighborhood for approximately twenty minutes but could not find his car. He called Detective Hammond and told him that his car was not there. Detective Hammond replied that in the short time it had taken him to travel from his apartment to the 1400 block of Water Street, his car had been towed by a private towing company called Freddy's Tow Company ("Freddy's). Freddy's had taken the car to the company's lot at 3101 S. 61st Street. Plaintiff Clendaniel immediately left for Freddy's.

62.     When Plaintiff Clendaniel arrived at Freddy's, an employee told him that he needed a "police release form" to get his car back. Plaintiff Clendaniel once more called Detective Hammond, who had not previously mentioned this form. Detective Hammond

confirmed that he needed it, and that it could only be obtained miles away at the PPD office at 4000 N. American Street. Plaintiff Clendaniel immediately called a ride service to go to this office. On his way out of Freddy's, Plaintiff Clendaniel tripped and fell. He was unable to walk, and an ambulance took him to Thomas Jefferson Hospital, where he was diagnosed with a dislocated knee.

63. On November 14, 2022, finally able to walk short distances, Plaintiff Clendaniel went to the PPD office at 4000 N. American Street to get the release form for his vehicle. There, a PPD officer told him that Freddy's could have easily faxed a request for the paperwork to the office instead of Plaintiff Clendaniel going there in person. The officer gave Plaintiff Clendaniel the release paperwork, and Plaintiff Clendaniel immediately took it to Freddy's.

64. Freddy's required Plaintiff Clendaniel to pay a 141-dollar fine before releasing his car.

**Plaintiff Matthias Wagman**

65. Plaintiff Wagman owns a 1996 Nissan Maxima. At all times relevant to this Complaint, he has held the vehicle's power of attorney, been an authorized driver under the vehicle's insurance policy, and been its sole operator. His parents gifted him the car but are the registered owners.

66. Plaintiff Wagman is a traveling nurse, and his job requires him to be out of the City for days and weeks at a time. Nevertheless, while he is in the City, Plaintiff Wagman checks on his car to make sure it is always where he parked it.

67. In or around July 2021, Plaintiff Wagman, who has a Zone 1 parking permit, parked his car in a legal Zone 1 spot near his apartment on 15th Street. He checked on his car throughout the week.

68.     On July 29, 2021, Plaintiff Wagman received a letter from the City, stating his vehicle was parked in a metered parking spot at 13th and South Streets, and that he had seven unpaid parking tickets. Realizing his car had been courtesy towed, Plaintiff Wagman immediately went to 13th and South Streets to retrieve his vehicle.

69.     Plaintiff Wagman appealed the seven parking tickets he received. He was denied at every stage of the appeal process.

70.     In or around January 2022, having exhausted his administrative appeals, Plaintiff Wagman appealed his case to the Philadelphia Court of Common Pleas.

71.     On November 30, 2022, Plaintiff Wagman attended a scheduled hearing before Judge Ann Marie B. Coyle, Jr. ("Judge Coyle") in the Philadelphia Court of Common Pleas. Judge Coyle informed Plaintiff Wagman that because he had no written proof that his vehicle had been courtesy towed, he was responsible for paying the parking tickets—notwithstanding the fact that the City has no means by which a vehicle owner or operator can obtain written proof that his vehicle has been courtesy towed.

72.     On December 2, 2022, Judge Coyle issued an order denying Plaintiff Wagman's appeal.

73.     After Judge Coyle's December 2, 2022 order, Plaintiff Wagman paid 808 dollars in tickets resulting from the courtesy tow.

**Plaintiff Rhoda Smith**

74.     Plaintiff Smith owned a 2015 Chevrolet Cruze, which she kept and drove in the City. At all times relevant to this Complaint, she was the vehicle's registered owner and sole operator.  Plaintiff Smith resides in Philadelphia but holds a part-time job in Florida. She travels to Florida once a month for work.

75.    On February 9, 2022, Plaintiff Smith parked her vehicle in a legal parking spot at 3rd and Bainbridge Streets.

76.    On February 10, 2022, she left for Florida.

77.    On February 21, 2022, she returned from Florida to find that her car was not there. She searched the neighborhood for approximately forty-five minutes and found her vehicle up the block in a metered parking spot. There were four tickets on the windshield totaling 404 dollars.

78.    She immediately went to the Third Police District to ask if there was a record that her car had been courtesy towed. An officer (name unknown) told her that PECO or Philadelphia Gas Works might have done work on a house at 3rd and Bainbridge Streets and encouraged her to contact them directly. Plaintiff Smith called PECO, who could not confirm the company had done work on the street but gave her the names of seven towing companies it contracted with for vehicle tows. Plaintiff Smith called all seven towing companies, and none had a record of her vehicle tow. Plaintiff Smith then called Philadelphia Gas Works, who denied that the company had done any work where she had originally parked.

79.    A few days later, Plaintiff Smith went to PPA's office to appeal her parking tickets. There, she was told to fill out paperwork and place it in a mailbox outside. Plaintiff Smith did as she was told.

80.    After several weeks, Plaintiff Smith had not heard from PPA regarding her appealed parking tickets. Therefore, in or around April of 2022, she placed a second appeal request in the same designated PPA mailbox.

{00235045 }                                    16

81.    Several days later, PPA informed her that she had missed her administrative appeal deadline (during the period when PPA failed to respond to her first appeal submission), and that she would need to appeal her tickets to the Philadelphia Court of Common Pleas.

82.    On April 4, 2022, Plaintiff Smith sold her car because she never wanted to be courtesy towed again.

83.    Plaintiff Smith intends to appeal her parking tickets to the Philadelphia Court of Common Pleas.

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs seek to represent a Class pursuant to Fed. R. Civ. P. Rule 23 (b)(2) and Fed. R. Civ. P. 23(b)(3), defined as follows:

> All persons who, within two years before the filing of the complaint in *Eastman v. City of Philadelphia*, 2:21-cv-02248 (May 17, 2021) up to and including the date of class certification, had their vehicles relocated by the City of Philadelphia under the Relocation Program (the "Class").

85.    The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of people affected is unknown, Plaintiffs believe that Class may number in the thousands.

86.    The common questions include:

a.    Whether the City engaged in the conduct alleged herein, and in particular the failure to provide adequate notice of towing, location of vehicles towed, removal to locations where parking was not permitted, and not removing vehicles from "stolen vehicle" databases;

b.    Whether Plaintiffs' and the Class members' rights were violated;

c.    Whether Plaintiffs and the Class members are entitled to money damages and the measure of damages; and

d.    Whether Plaintiffs' and the Class members are entitled to injunctive or declaratory relief.

87.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all Class members were affected by Defendant's conduct described above and assert the same claims for monetary and equitable relief.

88.    Plaintiffs and their counsel will fairly and adequately represent the interests of the Class members. Plaintiffs have no interest antagonistic to, or in conflict with, the interests of the Class members. Plaintiffs' attorneys are experienced in the prosecution of class action and civil rights litigation.

89.    Class certification under Rule 23(b)(2) is appropriate because the Defendant acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

90.    Class certification under Rule 23(b)(3) is appropriate because Defendant has injured and harmed the Class in the same manner, through the same conduct, and questions of law or fact common to the Class members predominate over any questions affecting the individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**COUNT I**
**Violation of the Fourteenth Amendment**
**42 U.S.C. § 1983**

91.    Plaintiffs incorporate paragraphs 1 through 90 as though fully set forth herein.

92.    The use and enjoyment of one's vehicle (whether one owns or is an operator of such vehicle) is a property right protected by the Due Process Clause of the Fourteenth Amendment.

93.    The City has violated the Fourteenth Amendment due process rights of Plaintiffs and the Class members through the Relocation Program in the following ways:

a.  The Relocation Program, as a matter of policy, practice, and custom, fails to provide adequate post-deprivation notice to those whose legally parked vehicles are towed;

b.  The Relocation Program, as a matter of policy, practice, and custom, fails to employ reasonably practicable, available procedures to maintain records of relocated vehicles and fails to inform owners or operators of the whereabouts of their vehicles, thereby depriving owners and operators of any adequate post-deprivation process;

c.  The Relocation Program, as a matter of policy, practice, and custom, fails to provide sufficient safeguards for owners or operators whose vehicles have been towed from legal spaces to spaces that are or become illegal spaces, time limited spaces, or metered spaces and who then are cited for parking infractions and/or have their vehicles impounded;

d.  The Relocation Program, as a matter of policy, practice, and custom, fails to provide adequate safeguards against improper listing of towed vehicles as stolen; and

e.  The Relocation Program, as a matter of policy, practice, and custom, fails to train City personnel, including PPD, on how to maintain records of vehicle relocations and respond to reports from vehicle owners and operators that a vehicle has been relocated.

## COUNT II
## Violation of the Fourth Amendment
## 42 U.S.C. § 1983

94.  Plaintiffs incorporate the allegations of paragraphs 1-93, as though fully set forth herein.

95.  The City has violated the Fourth Amendment rights of the Plaintiffs and the Class members because the Relocation Program, as a matter of policy, practice, and custom, results in the unreasonable seizure and displacement of their vehicles in the absence of any wrongdoing on their part and in the absence of adequate safeguards to protect against arbitrary loss of possession, use, and enjoyment of the vehicles that have been relocated.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully seek relief in the form of:

A.    certification of the Class defined above under Fed. R. Civ. P. 23(b)(2);

B.    declaratory and injunctive relief for Plaintiffs and the Class;

C.    certification of the Class defined above under Fed. R. Civ. P. 23(b)(3);

C.    compensatory damages for Plaintiffs and the Class;

D.    an award of attorneys' fees and cost of suit; and

E.    any further or other relief that the Court deems just and appropriate.


Dated: December 21, 2022

   /s/ Aarthi Manohar
Joseph C. Kohn (PA # 36565)
William E. Hoese (PA # 41787)
Aarthi Manohar (PA # 318874)
Elias A. Kohn (PA # 327743)
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700

David Rudovsky
Susan M. Lin
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
Telephone: (215) 925-4400

*Attorneys for Plaintiffs and the Class*