**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| ROBERT CLENDANIEL, JONATHAN | : | |
| DILLIPLANE, DANIELLE DITOMMASO, | : | CLASS ACTION |
| GRAHAM FOLEY, BENJAMIN GROSSMAN, | : | |
| MEGAN HECKERT, ALLEN RUE, JR., JASON | : | NO. 22-5092 |
| JENNINGS, KELLY LARSON, MACKENZIE | : | |
| SMITH, MICHAEL SMITH, RHODA SMITH, | : | JURY TRIAL DEMANDED |
| DANIEL TRAN, AUSTEN TRAVIS and | : | |
| MATTHIAS WAGMAN, | : | |
| individually, and on behalf of all others | : | |
| similarly situated, | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

-----------------------------------------------------------------x

**<u>AMENDED COMPLAINT</u>**

1.       Plaintiffs Robert Clendaniel, Jonathan Dilliplane, Danielle Ditommaso, Graham

Foley, Benjamin Grossman, Megan Heckert, Allen Rue, Jr., Jason Jennings, Kelly Larson,

Mackenzie Smith, Michael Smith, Rhoda Smith, Daniel Tran, Austen Travis, and Matthias

Wagman ("Plaintiffs") bring this action against The City of Philadelphia ("the City" or

"Defendant") for violations of their civil rights and the rights of the class members under the

Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C.

§1983.  Plaintiffs seek monetary damages and declaratory and injunctive relief on behalf of

themselves and the class.

## INTRODUCTION

2.      The City has a patchwork of practices, policies, and procedures, written and

unwritten, which collectively authorize the City, its agents, and employees, to relocate private

vehicles legally parked on the City's streets without adequate prior or post-tow notice to the

vehicle's owner or operator. The City refers to this practice and policy as "vehicle relocation."

The practice is also referred to as "courtesy towing" by the news media, the public, and certain

City employees. (For the purpose of this Complaint, the City's practice of courtesy towing or

relocating vehicles, and the patchwork of policies that allows this, will be referred to as the

"Relocation Program," and the terms "courtesy tow" and "vehicle relocation" will be used

interchangeably).

3.      Under the Relocation Program, the City and its agents tow cars to arbitrary spots

at considerable distances from their original locations, unbeknownst to the vehicle owner or

operator. These secondary locations are often illegal, metered, or timed parking spots. This

means that after a courtesy tow, vehicle owners and operators receive no notice or information

on the new location of their car and accrue tickets and parking fines through no fault of their

own. The Relocation Program currently has no mechanism in place to provide notice to vehicle

owners and operators after a courtesy tow or to ensure that tickets and fines are not assessed

against them.

4.      The City moves vehicles at its convenience and leaves it to vehicle owners and

operators to deal with the consequences. By failing to provide vehicle owners and operators

adequate notice or fair and adequate procedures for finding their vehicles, the Relocation

Program unreasonably and arbitrarily deprived Plaintiffs and the class members of their

possessory interests in the access to and use of their vehicles under the Fourth Amendment and without due process as required by the Fourteenth Amendment.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over the Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. §§ 1981, 1983, and 1988.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the Defendant is in this district and the acts and occurrences giving rise to the claims took place in this district.

## PARTIES

7.    Plaintiff Robert Clendaniel ("Plaintiff Clendaniel") is a resident of Pennsylvania.

8.    Plaintiff Jonathan Dilliplane ("Plaintiff Dilliplane") is a resident of Pennsylvania.

9.    Plaintiff Danielle Ditommaso ("Plaintiff Ditommaso") is a resident of Pennsylvania.

10.    Plaintiff Graham Foley ("Plaintiff Foley") is a resident of Pennsylvania.

11.    Plaintiff Benjamin Grossman ("Plaintiff Grossman") is a resident of Pennsylvania.

12.    Plaintiff Megan Heckert ("Plaintiff Heckert") is a resident of Pennsylvania.

13.    Plaintiff Allen Rue, Jr. ("Plaintiff Allen Rue") is a resident of Pennsylvania.

14.    Plaintiff Jason Jennings ("Plaintiff Jennings") is a resident of Pennsylvania.

15.    Plaintiff Kelly Larson ("Plaintiff Larson") is a resident of Pennsylvania.

16.    Plaintiff Mackenzie Smith ("Plaintiff Mackenzie Smith") is a resident of Pennsylvania. She is Plaintiff Michael Smith's daughter.

17.     Plaintiff Michael Smith ("Plaintiff Michael Smith") is a resident of Pennsylvania. He is Plaintiff Mackenzie Smith's father.

18.     Plaintiff Rhoda Smith ("Plaintiff Smith") is a resident of Pennsylvania and Florida. She is not related to Plaintiffs Michael or Mackenzie Smith.

19.     Plaintiff Daniel Tran ("Plaintiff Tran") is a current resident of New Jersey and a former resident of Pennsylvania.

20.     Plaintiff Austen Travis ("Plaintiff Travis") is a resident of Pennsylvania.

21.     Plaintiff Matthias Wagman ("Plaintiff Wagman") is a resident of Pennsylvania.

22.     Defendant is a Pennsylvania municipal entity capable of being sued under Pennsylvania law.  At all times relevant hereto, the decisions and actions complained of herein were made by the agents of the City pursuant to the City's official and unofficial policies or practices.

23.     The Philadelphia Police Department ("PPD"), a law enforcement agency, is an agency of the City charged with enforcing state and City laws. The City of Philadelphia is the legal entity responsible for the PPD.  With respect to the policies, practices, and customs enabling the Relocation Program, the City has acted by and through the PPD and its employees as its duly authorized agents acting within the scope and course of their duties and employment and under the color of state law.

24.     The Philadelphia Department of Streets ("Streets Department") designs, builds, and repairs the City's streets and roadways and is involved in the City's Vehicle Relocation Program.  The City of Philadelphia is the legal entity responsible for the Streets Department. With respect to the policies, practices, and customs enabling the Relocation Program, the City has acted by and through the Streets Department and its employees as its duly authorized agents

acting within the scope and course of their duties and employment and under the color of state law.

25.     The Philadelphia Department of Licenses and Inspections ("Licenses and Inspections") reviews plans and issues permits regarding projects impacting street parking and inspects construction projects and is involved in the City's Vehicle Relocation Program. The City of Philadelphia is the legal entity responsible for Licenses and Inspections.  With respect to the policies, practices, and customs enabling the Relocation Program, the City has acted by and through Licenses and Inspections and its employees as its duly authorized agents acting within the scope and course of their duties and employment and under the color of state law.

26.     The Philadelphia Water Department ("Water Department") engages in water projects that impact parking within the City of Philadelphia and is involved in the City's Vehicle Relocation Program.  The City of Philadelphia is the legal entity responsible for the Water Department.  With respect to the policies, practices, and customs enabling the Relocation Program, the City has acted by and through the Water Department and its employees as its duly authorized agents acting within the scope and course of their duties and employment and under the color of state law.

## FACTS

### A.     THE CITY'S VEHICLE RELOCATION PROGRAM

27.     The City controls, manages, and effectuates all courtesy tows that occur in the City of Philadelphia.

28.     The City courtesy tows vehicles in three primary ways: (1) by or at the behest of PPD; (2) by a private towing company under contract with a City department or responding to a direct City Department request; or (3) by a private tow operator enforcing a temporary no

parking permit that the City issued and where the City also issued temporary no parking signs to the permit holder and authorized the City permit holder to use third party tow operators to relocate vehicles.

29.     For events, block parties, public gatherings, races, and street work, including but not limited to construction, repairs, or emergency maintenance, PPD's "Tow Squad" directly relocates vehicles. For instance, the Philadelphia Water Department may request that the Philadelphia Police Tow Squad move a vehicle and the Tow Squad will then respond to the call and relocate the vehicle.  Alternatively, PPD may authorize the Philadelphia Parking Authority ("PPA"),[1] or private tow operators, acting pursuant to contracts with the City and under the direction of the City, to relocate specific vehicles that PPD designates.

30.     At times, the City temporarily designates a location as not permitted for parking, and it authorizes and permits the relocation tow by a contractor or private tow operator acting pursuant to the City's contracts and permits under color of state law. These vehicle relocations occur when individuals require moving trucks, storage containers, or temporary dumpsters as well as for restaurant use and loading, construction projects, film crews, and other related uses.

31.     The Philadelphia Streets Department also relocates vehicles in this manner.  The City confirmed the Streets Departments role in the courtesy tow process in the related case of *Eastman v. City of Philadelphia*, No. 21-2248 (E.D. Pa.) ("*Eastman*"). "As to the Philadelphia Department of Streets, the Streets Department authorizes a courtesy tow for milling, paving, and other roadway restoration." *See* Defendant's Objections and Responses to Plaintiffs' First Set of

---

[1] The Philadelphia Parking Authority is an agency of the Commonwealth of Pennsylvania independent from the City of Philadelphia. The City of Philadelphia uses PPA tow truck operators to relocate vehicles where PPA responds to the City's requests and authorization to relocate vehicles.

Interrogatories in *Eastman*, p. 4 ("*Eastman* Interrogatories"). "For paving and other roadway restoration, the Streets Department's traffic unit provides the temporary no-parking signs…" and "an inspector [from the Streets Department] will determine if vehicles are in the way and, if so, contact the third-party tow company that has the citywide contract for towing." *Id.*

32.    The City also grants temporary no parking permits to individuals or third-party entities and charges a fee for such permits.  To begin the process, an applicant seeking a "Temporary No Parking" permit applies on Defendant's website at

https://www.phila.gov/services/cars-parking-transportation/apply-for-a-parking-permit/apply-for-a-temporary-no-parking-permit/. The Philadelphia Department of Streets then determines whether to issues the Temporary No Parking Permit. If granted, the City then requires payment be delivered to the City,  after which the permit is issued.  The applicant then must take the permit to the assigned local Philadelphia Police district. The Philadelphia Police Department then provides official "Temporary No Parking Signs" designed and printed by the City permit holder. The permit holder may then contact PPD to relocate vehicles which are parked in the temporary no parking spaces pursuant to the permit the City issued.

## B.    <u>INADEQUATE NOTICE AND SUBSEQUENT INJURY</u>

33.    The Relocation Program does not provide adequate pre or post-tow notice to vehicle owners or operators.

34.    The City authorized "No Parking Signs" used for vehicle relocations provide inadequate notice to vehicle owners who were previously parked in a location that their vehicles were towed and provide no information regarding where the vehicle was taken. The signs provide no telephone number, website, or other information that would facilitate locating the towed vehicles. The signs do not provide an address or distance to which the temporary no

parking sign applies.  Additionally, the City does not monitor where these signs are posted or if they were even properly posted at all before a relocation tow was performed.

35.    There is no formal policy or procedure requiring a tow operator, whether the PPD tow square or a contractor, to relocate a vehicle to a designated lot or parking space. Informally, relocated vehicles are supposed to be moved to legal parking spots a short distance from where they were originally parked. But the City does not enforce this rule, and, as a matter of practice and custom, vehicles are usually relocated to illegal, metered, or timed spots at significant distances from their original locations.

36.    The City takes no action to alert PPA not to ticket or impound a vehicle that has been relocated to a metered or zoned spot. For example, the City elects not to leave documentation on relocated vehicles instructing PPA against ticketing them, or provide the license number or any other information to PPA that the vehicle was moved by the City to that location. Additionally, the City does not require PPA to attempt to notify vehicle owners prior to or after a tow.

37.    As a result, vehicle owners are not only unable to find their cars after courtesy tows but are also responsible for paying tickets and fines they have accrued through no fault of their own.

38.    Because the City does not adequately track or record vehicle relocations or provide vehicle owners and operators with any information related to the new location of their vehicle, PPA routinely denies challenges to the tickets resulting from the courtesy tows.

39.    The City provides inadequate pre- or post-tow notice to vehicle owners regarding the taking and relocation of their property, even though the City can readily determine a vehicle owner's address to notify the owner of a tow simply by looking up a vehicle's license plate and

even though such a protocol is already in place for notifying vehicle owners whose cars have
been impounded for City Code violations.[2] This protocol could easily be applied to courtesy
tows. The City also does not provide the same level of information PPA makes available when
PPA tows vehicles.

40.     There is no City department or employee responsible for maintaining records or a
centralized repository related to vehicle relocations. The City's Streets Department and
Department of Licenses and Inspections track permitting and other street closure-related
operations. Yet the City chooses not to assign these departments (or any department)
responsibility for tracking vehicle relocations, which are often the result of street closures
permitted by these departments.

41.     The Relocation Program does not require that notice be posted at a vehicle's
original parking location, advising owners and operators where their cars have been taken or how
to find them. The City does not post a simple sign with a telephone number or website which
could provide the license number and new location of the vehicle.

42.     The only information about how to retrieve a vehicle after it has been courtesy
towed is on a page buried several levels down on the City's website, which suggests only that a
call should be made to the PPD district where the vehicle was originally parked.[3]

_____

[2] The City impounds private vehicles parked on City streets for specific infractions enumerated
in the City Code. Procedures for notifying vehicle owners of their impounded vehicles include a
publicly accessible database to assist them in locating and recovering their vehicles. The City
does not provide any similar procedures for the Relocation Program.
[3] The following appears on the City's website for those who can find it and is generally
inaccurate, given that relocated vehicles are often ticketed or impounded:

    In some cases, the Philadelphia Police Department will relocate cars without ticketing or
    impounding them. Your car may get relocated if it is parked in a Temporary No Stopping

43.     Despite the webpage guidance, there is no City training or directive for PPD about what to tell vehicle owners and operators who call about courtesy tows. At times, PPD contacts the PPD Tow Squad to check if a vehicle is listed on the PPD "tow log." The tow log is an inaccurate and incomplete record of vehicle tows that lacks any real oversight and fails to list all vehicles that have been relocated or to completely identify the vehicle location and license number.

44.     The tow log is also problematic because the PPD radio unit, which frequently takes calls about vehicle relocations, does not track reports of courtesy tows because it is overburdened with 911 emergency calls. The City is aware of this problem but has done nothing to correct it.

45.     Similarly, after completing a courtesy tow at the direction of PPD, private tow operators are supposed to fill out a paper sheet, indicating the license plate, make, and model of the vehicle, and the locations from where and to where the vehicle was towed. They are then supposed to deliver this sheet to the police district where the tow occurred, so that PPD can update the tow log accordingly. However, there are no designated PPD officers to ensure these sheets are completed correctly or even turned in.  As a result, the sheets are infrequently turned in, and information about these tows does not make it into the PPD tow log, even when the slips are given to the PPD.

---

area. If you believe your car has been relocated, call the police district of the area where your car was parked.

- **Find my police district**

"Get Your Car Back When It Has Been Towed," City of Philadelphia, https://www.phila.gov/services/streets-sidewalks-alleys/get-your-car-back-when-it-has-been-towed/ (last accessed December 12, 2022).

46.    As a result, PPD is usually unable to locate courtesy towed vehicles in the tow log when asked about them. When this happens, PPD encourages vehicle owners and operators to report their cars as stolen even when they are not. Police officers have told vehicle owners that this system is problematic but it is the best that the officers can due based on the City's Relocation Program.

47.    At times, vehicle owners and operators find their relocated vehicles after reporting them stolen. Even if those vehicle owners and operators inform PPD that they have found their vehicles, due to lack of protocols, training, and supervision, PPD frequently fails to remove the found vehicle from the stolen vehicle database, causing the vehicle owners and operators to later be stopped, detained, or arrested by police, sometimes at gunpoint, for driving their own "stolen" cars.

48.    The City has failed to implement and use reasonably practicable procedures to notify owners that their vehicles have been towed or where the vehicles were taken. The City declines to use the mechanisms already available and in place for impoundments; fails to use the type of system PPA uses where tow operators have a handheld device to upload information about a vehicle and provide publicly accessible vehicle tow information; fails to train PPD officers, the PPD tow squad, or the Radio Unit on how to manage vehicle relocation information that could assist vehicle owners and operators; and neglects to oversee and maintain the PPD tow log for accuracy and correctness. As a result, the onus falls on vehicle owners and operators to search the City for their missing vehicles and pay any resulting fines.

49.    As a result of the City's policies, practices, and procedures, Plaintiffs and the

class members have suffered an unlawful interference with their Fourth Amendment possessory

rights in relation to their vehicles and have been deprived of adequate post-deprivation process in

violation of the Due Process Clause of the Fourteenth Amendment.

50.    The constitutional violations alleged in this Complaint are ongoing, and without

judicial relief will cause harm to the class members who will be subjected to the Relocation

Program.

51.    Plaintiffs and the class members have also been deprived of the use of their

vehicles; incurred fees and fines from parking violations and impoundments resulting from their

courtesy tows; loss of income from time missed from work spent searching for their vehicles;

expenses due to damaged vehicles as a direct result of the relocation tow; and expenses related to

car services and rentals used while they were unable to locate their vehicles.

## C.    ALL VEHICLE RELOCATIONS OCCUR UNDER COLOR OF STATE LAW

52.    The City has "a policy to relocate vehicles under circumstances" such as parades,

events, emergency situations, or construction. *See* Testimony of Matthew White *Eastman v. City

of Philadelphia* ("*Eastman*"), No. 21-02248, (E.D. Pa.) ("White Deposition" October 26, 2023 at

10).

53.    The City describes the Vehicle Relocation Program on its websites and states that

"[i]n some cases, the Philadelphia Police Department will relocate cars without ticketing or

impounding them. Your car may get relocated if it is parked in a Temporary No Stopping area. If

you believe your car has been relocated, call the police district of the area where your car was

parked." *See* CITY OF PHILADELPHIA, "Get Your Car Back When It Has Been Towed,"

https://www.phila.gov/services/streets-sidewalks-alleys/get-your-car-back-when-it-has-been-towed/ (last accessed January 31, 2023).

54.      The City's Vehicle Relocation policy is set forth in at least two distinct Philadelphia Police Department Directives.

55.      Police Directives are official City policies and practices that are binding on police officers.  The directive relating to the vehicle towing procedures constitute City policy.  *See* White Deposition, at 34-35.

56.      Philadelphia Police Department Directive 12.5 "Police Towing of Vehicles," explains that the "primary function(s) of the Police Tow Squad is the *relocation or impoundment* of vehicles" for numerous situations (emphasis added).

57.      Directive 12.5 distinguishes treatment for vehicle relocations from traditional vehicle impounds: "Under no circumstances should a copy of the Towing Report (75-7) be left with a vehicle, which was simply 'relocated.' The Police Tow operator will notify police radio of the location where the vehicle was 'relocated' to."  *See* Police Directive 12.5 – 2.

58.      The City's Vehicle Relocation program also consists of Philadelphia Police Department Directive 3.7 "Temporary no Parking Signs." Directive 3.7 states that "A Parking Violation Reports (PVRs) will not be issued to vehicles parked prior to the posting of "Temporary No Stopping' signs."

59.      Directive 3.7 states that police personnel will "[m]ake every effort" to locate a vehicle owner before issuing a summons for violations of "Temporary No Stopping" regulations.

60.      Directive 3.7 also states that "before issuing a summons for violations of 'Temporary No Stopping' regulations, police personnel will: Contact the District Operations Room Supervisor (ORS) and obtain a listing of all license plate numbers of the vehicles parked

at the location prior to the posting of the signs. (a) If no owner can be located for these vehicles, they will be relocated by Tow Squad. (b) Tow Squad will notify police radio with the license plate number and location of the relocated vehicle. Police Radio will enter the vehicle into the TOWE file."

61.    Directive 3.7 also instructs Officers to remove all "Temporary No Parking Signs" at the termination of the enforcement period.

62.    In Defendant's Objections and Responses to Plaintiffs' Requests for Admission in the related matter of *Eastman*, # 14 pg. 6 ("*Eastman* Admissions"), the City explained that the "Temporary No Parking" Signs are printed by the Streets Department and issued by the Streets Department and the Police Department.

63.    The City approves and/or authorizes the design and/or wording of the temporary no parking signs. *Id.* The signs state, "TEMPORARY POLICE REGULATION," "VEHICLES WILL BE TOWED," and "CITY OF PHILADELPHIA."  Permit holders given the temporary no parking signs are authorized by the City to call PPD to initiate vehicle tows in designated no parking areas.

64.    As part of the City's Vehicle Relocation Program, PPD Tow Squad will also directly place or hang the "Temporary No Parking" Signs. Lt. Michael Anderson, head of the Philadelphia Tow Squad, testified in the related matter of *Eastman v. City of Philadelphia*, that the official signs are white cardboard with red coloring that state "Temporary No Parking." The signs are "issued by the streets department, utilized by streets, police, water department. They are also provided for private events." "Anderson Deposition", Oct. 11, 2022 at 50: 24, 52: 6.

65.    Individual Philadelphia Police officers also oversee and distribute the "Temporary

No Parking" signs, such as for City permitted block parties or City permitted moving requiring use of a moving truck. *See* testimony of Corporal Vanessa Curry, Operation Room Supervisor of the 18th Philadelphia Police District of the Philadelphia Police Department, in the related case of *Eastman v. City of Philadelphia*, ("Curry Deposition" Oct. 28, 2022) at 160: 7-14.

66.    The Streets Department also posts temporary no parking signs when it is doing work, and individual permit holders can obtain the temporary no parking signs from the Streets Department or the local Philadelphia Police Department district. *See* Testimony of Steve Lorenz in *Eastman v. City of Philadelphia*, "Lorenz Deposition" (Oct. 7, 2022) at 12:8-18.

67.    PPD officers will instruct PPA tow operators to relocate a vehicle and PPA will only relocate the vehicle after a PPD officer places an Incident Report on the windshield. *See* Testimony of Anthony Kuczynski in *Eastman v. City of Philadelphia*, (Oct. 4, 2022) at 18:7-14; 19:11-24; 20:1-8; 13-17; 83: 3-7.

68.    As part of the City's Vehicle Relocation Program, the City also verbally instructs tow truck operators to relocate the vehicle as close as possible to where the car was originally parked. Anderson Deposition, at 47: 4-13.

69.    Under the City's Vehicle Relocation Program, private tow truck operators are required by contract to send the Philadelphia Police Department information regarding all vehicles relocated.  In practice, the City does nothing to monitor or enforce this requirement, or to train PPD or contractors to comply with it.

70.    As part of City's Vehicle Relocation Program, and for those tows performed by the contracted tower for the Streets Department, the tower is supposed to provide a list of relocated vehicles and their associated locations, which is then faxed to Police Radio. Police Radio is then supposed to enter the faxed information into a program called TOWE. *Eastman*

Interrogatories, # 7, at 6.  In practice, the City does not monitor or enforce this requirement and does not provide adequate training or instruction to the police.

71.    Philadelphia Police Officers follow practices and widespread customs as part of the Vehicle Relocation Program in responding to persons who state that their vehicle was legally parked and is now missing.  Officers customarily acknowledge that the vehicle was likely subject to a "relocation" or "courtesy tow" and that the persons should "look around the neighborhood to find a relocated car."  Ultimately, if the car is not readily found, police instruct owners to file a stolen vehicle report.

### D.    THE CITY DOES NOT FOLLOW THE DIRECTIVES, POLICIES, AND PROCEDURES OF ITS VEHICLE RELOCATION PROGRAM

72.    The City fails to enforce or adequately oversee its policies, customs, and practices comprising the City's Vehicle Relocation Program.

73.    The City takes no enforcement or oversight of when or where temporary no parking signs are placed.

74.    The City does not enforce the verbal instructions to tow truck operators about where to move cars. *See* Anderson Deposition at 46-47.

75.    The City has no police directive that provides guidance about how far a Philadelphia Police Tow Squad truck operator should take a vehicle to relocate it. *Id*.  Instead, there is a practice to attempt to relocate the car "nearby."  *Id.*

76.    The City does not enforce, monitor, or facilitate whether private tow operators contracted by the City submit tow slips with information regarding the vehicle relocations. In fact, the City could not and did not produce a single "tow slip" in its possession in response to the Rule

34 document request for such documents requests in the related case of *Eastman v. the City of Philadelphia*.

77.     The City does not require private tow operators to take a picture of a vehicle when towing pursuant to the City's Relocation Program, but requires private operators to take a picture of a car if towing a car from private property to the private operators lot. *See* Police Directive 12.5

78.     The Streets Department does not monitor the City's towing contractor to determine whether it is relocating vehicles to a legal parking spot on a nearby street, as required by the towing contract. *See* Lorenz Deposition at 47:24 to 48:19.

79.     After the Streets Department issues temporary no parking permits, it has no interaction with the permit holder except for requests to extend the permit. *See* Lorenz Deposition at 11:3-10. The Streets Department suggests that the permit holder post temporary no parking signs but does not check whether any sign is actually posted. *Id.* at 30:20 to 31:13. The Streets Department does not monitor whether Streets Department permit holders post any temporary no parking signs to notify the public.  *Id.* at 13:1-17; 17:3-10.

80.     The City does not enforce, monitor, or facilitate whether the Philadelphia Police Department enters information into the TOWE file.

81.     The City's instructions in Police Directive 3.7 that police personal will contact the District Operations Room Supervisor and obtain a listing of all license plate numbers of the vehicles parked at the location prior to the posting of the signs is merely a "technical requirement" that the City does not monitor or enforce. *See* Anderson Deposition at 57:10-58:10.

82.     The City has been deliberately indifferent to the harm that the Vehicle Relocation Program causes and has been deliberately indifferent to the training of its officers and

employees. Many City employees, for example, are unaware that the City even has a Vehicle Relocation Program, let alone how to follow it. This includes City employees in the law department who have stated that no Vehicle Relocation Program exists.

83.     The Streets Department, despite knowledge of complaints, discusses yearly potentially making changes and has consistently decided their current process is "probably the best that we can do at this point in time." Lorenz Deposition at 43:9-19 and 52:10-14.

84.     The Head of the Philadelphia Police Tow Squad is aware of complaints by citizens about their vehicles being relocated and has personally reached out to PPA to try and learn about PPA's systems of tracking tows and providing notice to the public through a website. To date, The City has taken no action to improve notice to vehicle owners under the Relocation Program. *See* Anderson Deposition at 91:3-11.

### E.     INADEQUATE DATA MANAGEMENT INCLUDING INACCURATE TOW LOGS DO NOT SHOW ALL VEHICLES THAT THE CITY <u>RELOCATES</u>

85.     Information about relocated vehicles is supposed to be sent to police districts and eventually to Police Radio where 911 dispatchers are supposed to enter all this information into a police database called TOWE. Use of the TOWE database is restricted to limited personnel who have completed requisite training and have access to the required computer systems. The TOWE database can be used to generate tow logs that are supposed to show all vehicles that were relocated and their new location.

86.     The Streets Department does not maintain any information on vehicles that are courtesy towed or relocated and instead the policy is that "tow lists generated by the contracted

tower are delivered to the Police Department." *Eastman* Interrogatories, # 14 at 8. When information is "delivered to the Police District," there is no digital system to track whether the information was provided, to whom it was provided, or to adequately store and access that information in a timely manner. For the Police Department, the collected information on relocated vehicles "is relayed and is meant to be entered into a database called the TOWE file." *Eastman* Interrogatories, # 14 at 8. The City does not oversee or ensure this happens and the TOWE file is incomplete and inaccurate.

87.     When the Chief Highway Engineer of the Streets Department, a veteran in that position for 20 years was asked about the TOWE file, he stated he had never heard of a tow file and "did not know that they have a database to keep track to where cars are towed to." Lorenz Deposition at 43:9-19.

88.     When Lt. Anderson, the head of the Police Tow Squad, was asked what happens after information from private tow truck operators about vehicle relocations is given to police districts he stated that he "believe[s] they are supposed to input it into the tow folder, but I am not sure if it's the district that does that or they send it to police radio. I am not sure." Anderson Deposition at 101:10-14.

89.     When an Operation Room Supervisor for the 18th District was asked whether the hard copy of the information the towing company provides gets entered into a computer system she answered "I believe that does not happen in the district. I've never seen anybody in a district do that." Curry Deposition at 149.

90.     Officers at the 18th Police District have contacted Police Radio requesting information about vehicle relocations in response to inquiries from people looking for their cars. The information about the relocated vehicles was not in the TOWE file even when Police Radio

had the information in its possession. *See* Curry Deposition at 50-51, 60-61.  In other words, even in cases where vehicle relocation information makes it to Police Radio, it still is not necessarily in the TOWE file or the tow logs.

91.    The City has no oversight to make sure Police Radio enters the information into the TOWE file. The City is aware of the staff shortages in Police Radio. The City is also aware that Police Radio does not, and likely cannot, prioritize documenting vehicle tow information even though the Unit is technically assigned that data entry task. *See* Curry Deposition at 137; 158, White Deposition, at 90.

92.    The City's "tow logs" are supposed to show information regarding a vehicle relocation but not all vehicles that have been relocated are listed in the tow logs and many vehicles listed in the tow logs have incorrect information. Incorrect information includes entering the same "towed from" and "towed to" location for numerous vehicles, missing license plate numbers, and missing VIN numbers.  Entries in the tow logs have also been entered days, weeks, or potentially months after a tow occurs. Indeed, the City has no requirement for when information about towed vehicles should be entered into the Tow File. *See* Anderson Deposition, at 82:21-83:2.

93.    The tow logs are not accessible to the general public and may not even be accessible to most PPD officers or City employees. The tow logs also fail to provide any real time tracking of vehicle relocations. The City does not use readily available and feasible alternative systems which provide centralized, internet available information to track the location of vehicles that were courtesy towed and/or relocated. *See Eastman* Admissions, # 12 at 5.

94.    The City does not use other readily available data management systems that would improve vehicle relocation information tracking. For example, the City elects to not

require the use of a District Control Number to manage data when the City handles the posting of Temporary No Parking signs as part of the Vehicle Relocation Program, even though the Police will be creating an Incident Report (75-48) that facilitates the creation and tracking of a DC number. *See* Philadelphia Police Directive 3.7.

95.     The City's non-electronic data management is antiquated, inadequate and does not provide a method to adequately track vehicle relocations.  For instance, Lt. Anderson testified that the storage of paper tow logs or reports at his facility "is not the best" and has "water damage problems sometimes." Anderson Deposition, at 102:11-21.

## PLAINTIFFS

### Plaintiff Robert Clendaniel

96.     On October 30, 2022, Plaintiff Clendaniel parked his 2009 Pontiac Vibe at 1014 Pine Street near his apartment. He has a Zone 4 parking permit, allowing him to park on that City block for any unlimited period of time. At all times relevant to this Complaint, Plaintiff Clendaniel has been the registered owner and sole operator of his vehicle.

97.     On November 1, 2022, Plaintiff Clendaniel checked on his car, and it was still where he had parked it.

98.     On November 5, 2022, Plaintiff Clendaniel went to use his car and found that it was not there. Assuming the car had been courtesy towed, he walked to the PPD station at 905 South Street to see if there was a record of his vehicle's relocation.

99.     At the station, an Officer Devlin confirmed that his car had probably been relocated. Officer Devlin called the Sixth Police District and the PPD tow squad to see if there was any record of the tow. Neither the Sixth Police District nor the PPD tow squad had a record of it. As a result, Officer Devlin told Plaintiff Clendaniel to search for his vehicle within a five-

block radius of where it had originally been parked. He told Plaintiff Clendaniel to call 911 in a few hours to report it stolen if he had not found it.

100.    Plaintiff Clendaniel returned to the 1000 block of Pine Street and asked the owners of the shops lining the block if they had seen any cars towed that day. The shop owners confirmed they had seen several cars towed because of City Water Department work.

101.    Per Officer Devlin's suggestion, Plaintiff Clendaniel searched for his car for approximately two hours. Unable to find it, he called 911 to report it stolen. An officer (name unknown) told him a squad car would come to his home for a stolen car report. Plaintiff Clendaniel waited approximately an hour and a half, but no squad car arrived.

102.    Plaintiff Clendaniel then called the Sixth Police District and asked if his vehicle had been courtesy towed. The Sixth Police District checked with the PPD tow squad and told him there was no such record. The Sixth Police District assured him that an officer would come out to Plaintiff Clendaniel for a stolen car report.

103.    Approximately twenty minutes later, a PPD officer (name unknown) arrived. He told Plaintiff Clendaniel his car had likely been relocated and contacted the PPD tow squad, who again had no record of the tow. The officer told Plaintiff Clendaniel that even though his car had been relocated, he would have to report it stolen. Plaintiff Clendaniel did. The officer did not provide Plaintiff Clendaniel with a copy of the stolen vehicle report. Before leaving, the officer encouraged Plaintiff Clendaniel to look for his car on "Columbus or Front Streets" because "that's where [relocated] cars end up a lot."

104.    On November 7, 2022, Plaintiff Clendaniel searched the City for his car but could not find it.

105.    On November 8, 2022, Plaintiff Clendaniel filed a stolen car claim with his insurance company.

106.    On November 10, 2022, a PPD Detective Hammond ("Detective Hammond") called Plaintiff Clendaniel and told him that his car had been found on the 1400 Block of Water Street in the Pennsport section of Philadelphia over a mile from where it was originally parked. Even though it was the middle of a workday, Plaintiff Clendaniel immediately called a ride service to go to his car.

107.    Upon arriving at the 1400 block of Water Street, Plaintiff Clendaniel was unable to locate his vehicle. He walked around the neighborhood for approximately twenty minutes but could not find his car. He called Detective Hammond and told him that his car was not there. Detective Hammond replied that in the short time it had taken him to travel from his apartment to the 1400 block of Water Street, his car had been towed by a private towing company called Freddy's Tow Company ("Freddy's"). Freddy's had taken the car to the company's lot at 3101 S. 61st Street. Plaintiff Clendaniel immediately left for Freddy's.

108.    When Plaintiff Clendaniel arrived at Freddy's, an employee told him that he needed a "police release form" to get his car back. Plaintiff Clendaniel once more called Detective Hammond, who had not previously mentioned this form. Detective Hammond confirmed that he needed it, and that it could only be obtained miles away at the PPD office at 4000 N. American Street. Plaintiff Clendaniel immediately called a ride service to go to this office. On his way out of Freddy's, Plaintiff Clendaniel tripped and fell. He was unable to walk, and an ambulance took him to Thomas Jefferson Hospital, where he was diagnosed with a dislocated knee.

109.    On November 14, 2022, finally able to walk short distances, Plaintiff Clendaniel went to the PPD office at 4000 N. American Street to get the release form for his vehicle. There, a PPD officer told him that Freddy's could have easily faxed a request for the paperwork to the office instead of Plaintiff Clendaniel going there in person. The officer gave Plaintiff Clendaniel the release paperwork, and Plaintiff Clendaniel immediately took it to Freddy's.

110.    Freddy's required Plaintiff Clendaniel to pay a 141-dollar fine before releasing his car.

**Plaintiff Jonathan Dilliplane**

111.    Plaintiff Jonathan Dilliplane is a resident of Philadelphia who owns a 2013 Honda Civic that has been relocated three times since 2021.

112.    At all times relevant to this Complaint, he was the registered owner of the Honda and had a valid Zone 1 Parking permit.

113.    Plaintiff Dilliplane parked his Honda on Spruce Street between 20th and 21st streets in Philadelphia in late August on the same block where Plaintiff Dilliplane lives. He checked on his car almost every day to make sure that the City's Temporary No Parking signs were not posted.

114.    On or about September 2, 2022, Plaintiff Dilliplane discovered a sign strung to a tree about three to five car lengths away from his Honda. The sign was not an official City sign and stated that the City had run out of Temporary No Parking signs and that PPD had instructed the resident to use this sign instead. The sign explained that the residents who had put up the sign were moving into a home and needed parking for a moving vehicle.

115.    The City had granted the City permit authorizing the temporary no parking for a moving event and had issued the sign that authorized the resident to use PPD to direct the relocation of Plaintiff Dilliplane's vehicle.

116.    Plaintiff Dilliplane cautiously assumed this was an official sign and the City had actually run out of Temporary No parking Signs. But he reasonably concluded that the sign applied to the immediate area where it was posted and did not extend farther down the block to the area where his vehicle was parked because the sign was only posted at the one location where the moving was to occur, no other signs were posted on the street, the sign indicated needing an area to assist moving versus a larger construction type project, and the sign stated nothing about extending beyond a larger area or extending for the entire block.

117.    The next morning, when Plaintiff Dilliplane was heading to work at Parc in Rittenhouse where he is a chef, he noticed that his car was gone.

118.    Plaintiff Dilliplane assumed that his car had been relocated based on past experiences and interactions with the City. He was aware of the City's practice that vehicle owners looking for their vehicle should call PPD. He therefore called the 9th District to ask about his car's location and PPD officers told him that his car was relocated, but they did not know where his car was.

119.    Plaintiff Dilliplane spoke with multiple police officers at the 9th Police District, but none knew where his vehicle was. PPD officers at the 9th District also told Plaintiff Dilliplane that there should be a log regarding his relocated vehicle, but that they did not know where the log was and so the best thing he could do was to report the car as stolen. The officer stated once a report is filed then if PPD officers find the car, officers would contact him. Plaintiff

Dilliplane asked why he would file a stolen vehicle report if the car was relocated by the City as this process struck Plaintiff Dilliplane as wasteful and illogical.

120.    The police lamented that he wished there was a better system in place but that this was the best he could do given the program the City uses.

121.    Plaintiff Dilliplane said please do whatever you have to do to find my car and is unaware if a stolen vehicle report was ever filed.

122.    Plaintiff Dilliplane asked what he can do to prevent the City from relocating his car in the future, such as on days when he has to park a mile or so from his house due to parking limitations. The officer said the only option is to check on your car every day.

123.    About two and a half hours later, a police officer called Plaintiff Dilliplane and said that PPD located his car and that it was in a PPA lot. Plaintiff Dilliplane left work and paid for an Uber to go to the lot to recover his vehicle.

124.    To recover his property that the City had taken and moved, he had to pay the PPA around $250 and was not able to challenge the payment before recovering his property.

125.    Plaintiff Dilliplane then learned how his vehicle was impounded. PPD officers had gone to the location where his vehicle was parked and had issued parking tickets and instructed PPA to tow specific vehicles that PPD determined was necessary to effectuate the City's temporary no parking permit for the resident who was moving.

126.    Plaintiff Dilliplane was present in his home and lived on the street where his vehicle was parked. If PPD officers had knocked on doors on that block of Spruce Street between the time he parked his vehicle and PPD instructed PPA to tow his vehicle, Plaintiff Dilliplane could have moved his vehicle.

127.    PPA, at the authorization and instruction of PPD, had towed his vehicle to an impound lot, despite the City's and PPA's policies that vehicles be relocated to the closest legal spot.

128.    PPD or PPA had also issued a parking ticket in the amount of $50 for parking between posted signs, ostensibly referring to the ambiguous temporary no parking sign that served as a replacement to the City's more official sign.

129.    Plaintiff Dilliplane challenged that $50 parking ticket, and as he was awaiting his challenge, he was fined for not yet paying the $50 parking ticket. Plaintiff Dilliplane was not given an in-person hearing opportunity and was told that due to the type of ticket issued, he could only challenge the ticket online. PPA denied his online challenge.

130.    Plaintiff Dilliplane spent over $500 in parking tickets, fines, fees, and Ubers to recover his vehicle. He missed time at work and spent multiple hours looking for and recovering his property. He could only recover his property after paying a fee and had no process to challenge the impoundment before recovering the vehicle and faced inadequate process to challenge the monetary fees after recovering his vehicle.

131.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Dilliplane suffered an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of his vehicle without due process. He also suffered economic injuries.

**Plaintiff Danielle Ditommaso**

132.    Plaintiff Danielle Ditommaso is a resident of Philadelphia.

133.    At all times relevant for this Complaint, she was the sole owner of a 2013 Volkswagen Jetta, with the title in her name.

134.    On or around August 28, 2022, Plaintiff Ditommaso parked her Jetta near her residence of 2200 Ben Franklin Parkway.

135.    When she returned on the morning of August 30, 2022, her Jetta was gone.

136.    Plaintiff Ditommaso looked in the nearby area for her vehicle and saw "Temporary No Parking" signs near where she had parked her vehicle. These signs were not at the specific location where she had parked and were not visible to her when she had parked. The City signs provided no other information about what had happened to her vehicle or who to contact, unlike the signs that private tow operators use for tows that are not City relocation tows and that provide a phone number to contact.

137.    The City designed, printed, distributed, issued, permitted, and/or authorized the signs as part of its Vehicle Relocation Program.

138.    Plaintiff Ditommaso called the Philadelphia Police Department's 9th District to ask what happened to her Jetta.

139.    The Police Officer said that her vehicle was "relocated" based on where it was parked because Police were moving vehicles to make way for a music festival that the City hosts.

140.    The 9th District did not have any more information on where the City moved her vehicle, but suggested she call the next day because her car was "not in the system" yet.

141.    The next day, when Plaintiff Ditommaso called the 9th District, the Police Officer said her vehicle was still not in the system and she should "walk around" and look for where the City had taken and moved her property.

142.    The Officers also gave Plaintiff Ditommaso the phone number of multiple private tow operators the City works with and told her to call them to find out more information about her vehicle.

143.    None of the private tow operators knew the location of her vehicle and did not say that they had moved her vehicle.

144.    Plaintiff Ditommaso has a friend who lives in her building whose vehicle was also relocated from the same location at or around the same date. That person was able to find her relocated vehicle. Plaintiff Ditommaso's vehicle, however, that was relocated from a similar location at a similar date, was not taken to that same or general location.

145.    Plaintiff Ditommaso spent the next few weeks looking for her Jetta.

146.    About a month later, she called the 9th District again to ask where they had moved her property. The Police Officer told her that her vehicle was taken to Fairmont Park on West Sedgley Avenue.

147.    Plaintiff Ditommaso went to that location, but her Jetta was not there.

148.    At this point, unsure how to find her vehicle that the City had taken and lost, she reported her vehicle as stolen by the City to the Philadelphia Police Dept.

149.    Upon information and belief, the Police Incident Report states that her vehicle was relocated.

150.    The Philadelphia Police entered the vehicle into the Police records as a "try and locate."

151.    Plaintiff Ditommaso then filed a claim with the City for her lost vehicle.

152.    To date, no one from the City has gotten back to her about her claim.

153.    Before the City took and lost he property, Plaintiff Ditommaso used her vehicle for daily tasks and to visit her family in New Jersey.

154.    Before the City took and lost her property, Plaintiff Ditommaso was planning to sell her Jetta for at least three thousand dollars. Edmunds car appraising estimated a sale value of five thousand and four hundred dollars at the time her vehicle was taken and lost.

155.    Plaintiff Ditommaso never received notice that her car would be towed or was towed. Upon her own investigation, primarily walking around finding signs, near but not at the location she had parked, and calling the Police, she learned that the City had taken and moved her property, but the City was never able to tell her the actual location of her vehicle.

156.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Ditommaso suffered an unreasonable and arbitrary deprivation of her possessory interests in and access to and use of her vehicle without due process. She also suffered economic injuries.

**Plaintiff Graham Foley**

157.    Plaintiff Foley owns a 2004 Honda Civic. At all times relevant to this Complaint, Plaintiff Foley has been an authorized driver under the vehicle's insurance policy and its primary operator. His father gifted him the car but he remains the registered owner.

158.    Just after midnight on the morning of June 22, 2022, Plaintiff Foley parked his Honda Civic in a legal parking spot on the 1900 block of Reed Street. He saw that he had parked in a two-hour parking zone. The two-hour restriction did not apply at night but began at 8 a.m.

159.    Plaintiff Foley knew he could safely park his car, but that he would have to move it consistent with the time limitation later that morning.

160.    At approximately 8:30 that same morning, Plaintiff Foley went to repark his car but found it was not there. He saw several "Temporary No Parking" signs lining the street.

161.    The City designed, printed, distributed, issued, permitted, and/or authorized the signs as part of its Vehicle Relocation Program.

162.    These signs had not been posted anywhere on the street when he had parked the car earlier that morning.

163.    Plaintiff Foley understood that his vehicle had been courtesy towed pursuant to the City's Vehicle Relocation Program due to his past experiences and personal knowledge.

164.    He immediately called the 17th Police District to ask about his car. Nobody answered the phone.

165.    Approximately twenty-five minutes later, Plaintiff Foley went to 17 Police District in person to ask about his car. A desk officer and another officer checked the PPD tow log but said they were not sure where his car was. They encouraged him to contact PPA.

166.    Plaintiff Foley immediately called PPA, who directed him to call several PPA impound lots, including PPA's South Philadelphia lot at Weccacoe Avenue.

167.    Plaintiff Foley called the PPA lot at Weccacoe Avenue. A PPA agent informed him that his car was there.

168.    Approximately an hour later, Plaintiff Foley went to the Weccacoe Avenue lot to retrieve his car. PPA required Plaintiff Foley to pay a one hundred and seventy-five dollar fine before releasing his vehicle. A PPA agent assured him he would be reimbursed the one hundred and seventy-five dollars if he successfully appealed the fine to PPA.

169.    That same day, Plaintiff Foley went to PPA's office to appeal the fine in person. There, he was told to fill out paperwork and place it in a mailbox outside. Plaintiff Foley did as he was told.

170.    Approximately one week later, in or around late June of 2022, Plaintiff Foley called the 17th Police District once more to inquire about what happened to his car on the morning of June 22, 2022. He explained to the officer who answered that he had legally parked

his car when there were not any temporary no parking signs on the street. Plaintiff Foley

explained that PPD had issued and placed temporary no parking signs on the street overnight

before he had a chance to see them and move his car.

171.    Plaintiff Foley asked the officer if PPD maintained records of the temporary no

parking zones that are posted throughout the City.

172.    The officer responded, "This is a big City, and there's a lot going on. We don't

keep records of all temporary no parking zones."

173.    In or around August 2022, Plaintiff Foley received a letter from PPA, notifying

him that his appeal of the one hundred and seventy-five dollar fine had been denied. The letter

stated he was now responsible for paying an additional fine for his alleged parking infraction.

174.    Plaintiff Foley went on the PPA website to appeal the fine. The website indicated

that he also owed a late fee, which precluded an appeal.

175.    Approximately a week later, Plaintiff Foley called PPA. An agent told him PPA

did not have the ability to discharge his tickets and fines because of the apparent late fee.

Plaintiff Foley ultimately paid approximately seventy-five dollars in fines on top of the one

hundred and seventy-five dollars he had already paid.

176.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Foley suffered

an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of

his vehicle without due process. He also suffered economic injuries.

**Plaintiff Benjamin Grossman**

177.    Plaintiff Ben Grossman is an attorney who resides near the 1300 block of North

Newkirk Street in Philadelphia, Pennsylvania.

178.    His 2003 Hyundai Elantra is the first vehicle that Plaintiff Grossman ever owned. At all times relevant to this Complaint, Plaintiff Grossman was the owner of the Hyundai.

179.    Plaintiff Grossman's Hyundai was taken and relocated pursuant to the City's Vehicle Relocation Program around July 28, 2022. To date, his vehicle is still missing.

180.    Plaintiff Grossman parked his Hyundai on Pennsylvania Avenue between 27th and 28th Street in Philadelphia. That parking location was legal and had no restrictions or permit requirements. Plaintiff Grossman checked on his car in early July 2022.

181.    He returned on July 28, 2022, to check on his Hyundai, but it had disappeared.

182.    Plaintiff Grossman checked the PPA database, but it had no record of his vehicle. He called multiple private tow operators, but they also lacked any record of his car. Additionally, a phone operator from George Smith Towing Company told Plaintiff Grossman that his vehicle was not in a location that George Smith would have towed at that time.

183.    Unable to locate his car for additional days, Plaintiff Grossman then called the Philadelphia Police Department's 9th District on August 11, 2022, at 10:15 a.m. to report the vehicle as stolen. But the Police Officer told Plaintiff Grossman that his vehicle had almost certainly been relocated rather than stolen.

184.    The Officer explained that some type of City maintenance or utility work had occurred at that location around July 28, 2022, and vehicles had been relocated from Pennsylvania Avenue pursuant to the City's maintenance or utility work and pursuant to City authority.

185.    The Officer also said the make and model of the vehicle made it very unlikely that it was stolen. The Officer advised that vehicles parked on Pennsylvania Avenue are likely

relocated to the area surrounding Girard College and that Plaintiff Grossman should look in the Girard College area for his vehicle.

186.    Plaintiff Grossman checked those locations, but his vehicle was not there. He spent multiple weeks looking for the vehicle and by the Fall of 2022 again called and asked the Philadelphia Police Department about filing a report regarding how the City and the Police had lost his vehicle. The conversation was similar to the first time he spoke with the police officers and he was instructed to look for his relocated property on Sedgley Drive and the streets surrounding the Lemon Hill area of Fairmount Park.

187.    Plaintiff Grossman has walked, biked, and driven around Philadelphia looking for his disappeared vehicle but has still been unable to locate it.

188.    On January 17, 2023, Plaintiff Grossman decided to file a stolen vehicle report. The responding officer told him that if he had filed the report earlier, there might have been a better chance of finding his car that other officers told him had been relocated and that he should therefore look for without filing a stolen vehicle report.

189.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Grossman suffered an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of his vehicle without due process. He also suffered economic injuries.

### Plaintiffs Megan Heckert and Allen Rue, Jr.

190.    In or around August 2022, Plaintiffs Heckert and Rue parked their 2007 Honda Fit in a legal parking spot on the 2100 block of Arch Street.

191.    Plaintiffs Heckert and Rue have a Zone 6 parking permit, allowing them to park on that City block for any unlimited amount of time. At all times relevant to this complaint,

Plaintiffs Heckert and Rue were the registered owners and operators of the Honda Fit and authorized drivers under the vehicle's insurance policy.

192.    On the afternoon of September 18, 2022, Plaintiffs Heckert and Rue returned to the location where they had parked their car but it had disappeared.

193.    Plaintiffs Heckert and Rue assumed their Honda Fit had been courtesy towed based on their personal knowledge of the City's Vehicle Relocation Program, so Plaintiff Rue searched for it near Philadelphia's Lemon Hill Park, a place where courtesy towed vehicles often turn up.

194.    He ultimately found the car in that area on Sedgley Drive, a mile and a half from where it was originally parked. PPD had left a "complaint or incident" report on the car's windshield, indicating that the car had been courtesy towed at 4:30 a.m. that day.

195.    Plaintiff Rue got in the car to drive home. Upon starting, the car made a groaning noise, and the check oil light came on. The check oil light had not been on the last time the car was driven.

196.    As a result, on September 19, 2022, Plaintiff Rue took the car to the service station at Piazza Honda of Philadelphia.

197.    Later that day, a Piazza Honda mechanic called Plaintiffs Heckert and Rue and informed them that a dent in the car's oil pan had caused a leak, destroying the engine. He said that the damage to the car was the direct result of the courtesy tow, and that the tower had misapplied the towing hook to the vehicle. He explained the car was undriveable and required a new engine, costing approximately six thousand dollars.

198.    On September 19, 2022, now aware of the extent of the damage to their Honda Fit, Plaintiff Rue filed a police report in the 9th Police District regarding the courtesy tow that

had damaged their property. A PPD Officer O'Neill completed the report and cited the "Police Tow Squad G-8 Unit" as the "offending party." He encouraged Plaintiff Rue to file a claim against the PPD Tow Squad with the City's Office of Risk Management to seek reimbursement for the vehicle repairs.

199.    On September 21, 2022, Plaintiff Rue contacted Engine World in Deptford, New Jersey for a second opinion on his Honda Fit. A mechanic at Engine World informed him there were no replacement engines available for their vehicle.

200.    On September 22, 2022, Plaintiffs Heckert and Rue filed a claim with the City's Office of Risk Management via email and received a confirmation message in response. Plaintiff Heckert followed up on the status of the claim to no avail.

201.    On November 10, 2022, Plaintiff Heckert contacted the City's Office of Risk Management and spoke with an employee named Marc Joven who informed her that he had no record of the claim that Plaintiffs Heckert and Rue had filed and asked that they forward him a copy via email. Plaintiff Heckert forwarded him a copy via email.

202.    On December 28, 2022, Plaintiff Heckert again requested a status update on the claim from Joven. Joven informed her that the case had not yet been assigned to an adjuster with the City's Office of Risk Management.

203.    To date, the City's Office of Risk Management has failed to resolve Plaintiffs Heckert and Rue's claim.

204.    Plaintiffs Heckert and Rue spent over six thousand dollars to repair the Honda Fit that Defendant damaged when PPD Tow Squad relocated his vehicle.

205.    As a result of Defendant's Vehicle Relocation Program, Plaintiffs Heckert and Rue suffered an unreasonable and arbitrary deprivation of their possessory interests in and access to and use of his vehicle without due process. They also suffered economic injuries.

**Plaintiff Jason Jennings**

206.    Plaintiff Jason Jennings is a business owner who requires a car to get to work.

207.    He frequently drives to his job in the Northern Liberties section of Philadelphia in his 2016 Audi Q5.

208.    At all times relevant to this complaint, Plaintiff Jennings was the registered owner and operator of the Audi and an authorized driver under the vehicle's insurance policy.

209.    On or around September 11, 2022, at approximately 10 p.m., Plaintiff Jennings parked his car in a legal parking space on the 2100 block of Spruce Street near his home. At the time, Plaintiff Jennings had a Zone 1 parking permit, allowing him to park on that street for any unlimited amount of time.

210.    The following morning, on or around September 12, 2022, at 6:45 a.m., Plaintiff Jennings returned to where he had parked his car to drive to work but found it was not there.

211.    Assuming his car had been courtesy towed due to his personal knowledge of the City's Vehicle Relocation Program, Plaintiff Jennings approached a PPA officer patrolling the street and asked where his car might have been moved. The PPA officer encouraged Plaintiff Jennings to search the neighborhood for his vehicle. Plaintiff Jennings spent several minutes searching for his car to no avail.

212.    That same morning, Plaintiff Jennings called PPA to see if his Audi had been towed to a PPA impound lot. PPA informed Plaintiff Jennings that there was no record of his car

in any PPA lot and encouraged him to contact the 9th Police District for assistance in locating his vehicle.

213.    Plaintiff Jennings called the 9th Police District. An officer there told him that he would search PPD's tow log to see if the Audi was on the list of towed vehicles.

214.    The officer could find no record of Plaintiff Jennings' vehicle tow but told him that "just because [the vehicle] is not in our log, it doesn't mean [PPD] didn't tow it."

215.    The officer then encouraged Plaintiff Jennings to contact a local towing company to see if it had towed his car.

216.    Plaintiff Jennings called the towing company. He was told the towing company had not towed his car and had not towed any vehicles from the area where his car was originally parked.

217.    Plaintiff Jennings again called the 9th Police District where another officer directed him to call the towing company again.

218.    Plaintiff Jennings did as he was told and was again told by an employee of the towing company that the towing company had not moved the Audi. Plaintiff Jennings asked the employee where the towing company generally courtesy towed vehicles. The employee listed various locations throughout the City, none of which were near Plaintiff Jennings' original parking spot.

219.    Nevertheless, Plaintiff Jennings began searching the City on foot for the Audi at the various locations identified by the towing company. He did not find his car.

220.    Over the next few days, Plaintiff Jennings was forced to use ride services or walk approximately an hour each way to get to and from work. He contacted the 9th Police District approximately four times about the lost Audi. On each occasion, he spoke with officers who did

not know where the car was but who told him to travel to various, inconsistent locations

throughout the City to search for it. These locations included but were not limited to between

Broad Street and Washington Avenue and 30th Street and Washington Avenue and between

Sansom Street and Washington Avenue.

221.    Plaintiff Jennings took a half day off work to search these areas but was unable to

find the Audi. He also continued to look for the car after work.

222.    On or around September 14, 2022, Plaintiff Jennings contacted the 9th Police

District and informed an officer that he still had not found his car. The officer encouraged him to

report it stolen, which Plaintiff Jennings did.

223.    That same day, a police officer arrived at Plaintiff Jennings' home to complete the

stolen vehicle report. The officer did not provide Plaintiff Jennings with a copy of the stolen

vehicle report but wrote the district control number on a piece of paper and left it with him. The

officer told Plaintiff Jennings that he would search for the vehicle himself. The officer later

informed Plaintiff Jennings that he was unable to locate the car.

224.    On or about September 16, 2022, the same officer who had completed Plaintiff

Jennings' stolen car report called Plaintiff Jennings and told him that the Audi had been found at

22nd and Market Streets.

225.    Plaintiff Jennings immediately went to retrieve the Audi, which had been towed a

half mile from its original location to an illegal parking space. There were four hundred dollars'

worth of tickets on the windshield.

226.    The PPD officer who found the vehicle encouraged Plaintiff Jennings to appeal

the tickets, assuring him that he would not have to pay them because the vehicle had been

reported stolen when the tickets were issued.

227. Plaintiff Jennings appealed his tickets and supplied the district control number from his stolen vehicle report in connection with his appeal.

228. His appeal was denied.

229. Due to the tickets and fines caused by the Audi's courtesy tow, Plaintiff Jennings is now unable to obtain a Zone 1 parking permit.

230. Plaintiff Jennings intends to pay the tickets.

231. Additionally, because of the courtesy tow, Plaintiff Jennings was forced to pay for alternate staffing at his place of business, so that he could take time off work to search for his car.

232. As a result of Defendant's Vehicle Relocation Program, Plaintiff Jennings suffered an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of his vehicle without due process. He also suffered economic injuries.

**Plaintiff Kelly Larson**

233. Plaintiff Kelly Larson parked her 2012 Toyota Corolla on Lombard Street between Broad Street and 15th Street on or around October 29, 2022.

234. When Plaintiff Kelly Larson returned to her vehicle on November 11, 2022, around 7:00 a.m., her vehicle was gone.

235. At that location, there were now "Temporary No Parking Signs" that the City of Philadelphia had designed, printed, distributed, issued, permitted, and/or authorized.

236. At that location, there was also construction work occurring that the City of Philadelphia had authorized, permitted, oversaw, and/or conducted.

237.     Plaintiff Larson, trying to figure out where her property was taken, looked up the PPA database but found no information about her vehicle. Plaintiff Larson then called the PPA parking violation numbers that only had an automated phone number to text. She texted the number around 7:00 a.m. and was placed in a queue and told that she was third in line.

238.     Plaintiff Larson remained in the queue until she manually left it almost twelve hours later at 5:45 p.m. She had been notified that her wait time would be seven to ten minutes every fifteen minutes for that entire duration.

239.     Plaintiff Larson then paid for an Uber to a PPA impound lot in South Philadelphia to look for her vehicle. An employee at the impound lot told her that her vehicle was not there and was probably courtesy towed and that she should look around the area her car was originally parked to find it.

240.     Plaintiff Larson paid for another Uber to return home and go to work, for which she had missed time due to looking for her missing property. Plaintiff Larson then rode her bicycle around multiple streets searching for her relocated Toyota.

241.     Still unable to find her vehicle, she looked up courtesy towing online and found an article explaining this Philadelphia phenomenon where Defendant has created a system of relocating and losing private property. Plaintiff Larson read that vehicle owners should call the police for assistance as the City of Philadelphia has failed to provide any other form of assistance to notify property owners or help them locate their property.

242.     Plaintiff Larson next called two police districts but neither had any record of her vehicle.

243.     Plaintiff Larson later returned to the location where her vehicle had been taken and saw other people looking for their vehicles. A police car was also at the location and an

officer provided phone numbers of multiple tow companies. Plaintiff Larson called the numbers until one of the tow companies, called Jane Way Towing, knew the location of her vehicle. Plaintiff Larson subsequently found her vehicle around 1401 Water Street, about two miles from where she had left her property.

244.    Due to Defendant's actions that permitted a temporary no parking event, provided official City "Temporary No Parking Signs," and authorized a third party tower to move cars to effectuate the City issued permit, but then failed to provide any notice or information on where Plaintiff Larson's property was taken, Plaintiff Larson spent multiple hours searching for her lost property, paid about fifty dollars in Uber fees, and missed time from work.

245.    Additionally, multiple Philadelphia Police Officers spent time assisting residents trying to locate their vehicles as Defendant has failed to create a system to locate and track relocated vehicles.

246.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Larson suffered an unreasonable and arbitrary deprivation of her possessory interests in and access to and use of her vehicle without due process. She also suffered economic injuries.

**Plaintiffs Mackenzie and Michael Smith**

247.    Plaintiff Mackenzie Smith is an intensive care unit nurse who requires a car to get to work. She frequently drove to her job in her 2013 Honda Civic (the "Honda Civic") from her home in the Fairmount section of Philadelphia. At all times relevant to this Complaint, Plaintiff Mackenzie Smith was the sole operator of the Honda Civic and an authorized driver under the car's insurance policy. Her father, Plaintiff Michael Smith, gifted her the vehicle but remained its registered owner.

248.    In or around March 2022, Plaintiff Mackenzie Smith drove home from work and parked the Honda Civic in a legal parking spot with no time limitations at the intersection of Corinthian and Poplar Streets near her home.

249.    Approximately one week later, she returned to that location to use her vehicle but found it was not there.

250.    Plaintiff Mackenzie Smith assumed her vehicle had been courtesy towed. She contacted Plaintiff Michael Smith for advice about retrieving the vehicle. Plaintiff Michael Smith suggested she contact the police.

251.    Plaintiff Mackenzie Smith called the 9th Police District. She spoke to an officer (name unknown), who told her there was no record that her vehicle had been towed. He advised her to search for her car within a two-block radius of the original parking spot because that was where vehicles were usually relocated.

252.    Plaintiff Mackenzie Smith searched for her car for approximately an hour and a half within a four to five-block radius of the original parking spot but could not find it. She also contacted three local private towing companies to see if they had towed her vehicle. Each towing company told her they had no record of the tow.

253.    Plaintiff Mackenzie Smith again contacted the 9th Police District for assistance. An officer (name unknown) arrived and completed a stolen vehicle report. The officer did not give her a copy of it but wrote the district control number on a scrap of paper and left it with her.

254.    In or around late March 2022, now believing the Honda Civic was stolen, Plaintiffs Mackenzie and Michael Smith reported the theft to their insurance company. During this time, Plaintiff Mackenzie Smith paid for car rental and ride services to travel to and from work.

255.    On March 30, 2022, Plaintiff Michael Smith purchased a used Subaru Forrester for Plaintiff Mackenzie Smith.

256.    On March 31, 2022, the insurance company processed the claim for the stolen Honda Civic. The amount reimbursed to the family for the stolen vehicle did not fully cover the cost of the Subaru Forrester.

257.    On April 18, 2022, Plaintiff Mackenzie Smith visited her mother and Plaintiff Michael Smith at their home in Phoenixville, Pennsylvania. She checked her phone and saw that she had received a voicemail from a PPD Officer Morton. He told her that the Honda Civic had been found at 800 N. 23rd Street, (a third of a mile from where she had originally parked it), with multiple tickets on the windshield. He explained that she had fifteen minutes to reclaim the vehicle before it was towed.

258.    Plaintiff Mackenzie Smith immediately called Officer Morton and explained that she could not get to the vehicle in fifteen minutes because she was in Phoenixville. Despite the situation, Officer Morton authorized the tow of the Honda Civic, and PT&T Towing, a private towing company, moved the vehicle to a lot at 3200 S. 61st Street.

259.    Plaintiff Michael Smith called the family's insurance agent and told him that the Honda Civic had been found. The insurance agent informed him that because the vehicle was now the property of the insurance company, the family could not go to the private tow lot to recover it or remove any personal belongings from it. The family was also not allowed to collect the parking tickets on the windshield of the car.

260.    In the months that followed, Plaintiff Michael Smith began receiving letters from the Philadelphia Parking Violations Branch, notifying him that he was delinquent in paying the hundreds of dollars' worth of parking tickets on the Honda Civic, even though he had no way of

retrieving them. The letter indicated that the tickets were for parking in a two-hour zone, parking in a school zone, and for an expired inspection. During the near month that the vehicle had been relocated, the vehicle's inspection had expired unbeknownst to Plaintiff Mackenzie Smith, who always kept the inspection current.

261.    In or around May 2022, Plaintiff Michael Smith began appealing the parking tickets that had resulted from the courtesy tow. During that month, Plaintiff Mackenzie Smith and her mother called the 9th Police District and requested the stolen vehicle report to submit in connection with the ticket appeals. The 9th Police District told them to come to the 9th Police District's office for a copy.

262.    Plaintiff Mackenzie Smith and her mother went to the office. An officer (name unknown) informed them that the 9th Police District did not have the stolen vehicle report, and that they should go to City Hall and request it from the Department of Records.

263.    Plaintiff Mackenzie Smith's mother went to City Hall and was unable to obtain a copy of the stolen vehicle report.

264.    Plaintiff Michael Smith's appeals of the parking tickets from the courtesy tow were denied, and he paid the tickets.

### Plaintiff Rhoda Smith

265.    Plaintiff Smith owned a 2015 Chevrolet Cruze, which she kept and drove in the City. At all times relevant to this Complaint, she was the vehicle's registered owner and sole operator.  Plaintiff Smith resides in Philadelphia but holds a part-time job in Florida. She travels to Florida once a month for work.

266.    On February 9, 2022, Plaintiff Smith parked her vehicle in a legal parking spot at 3rd and Bainbridge Streets.

267.     On February 10, 2022, she left for Florida.

268.     On February 21, 2022, she returned from Florida to find that her car was not there. She searched the neighborhood for approximately forty-five minutes and found her vehicle up the block in a metered parking spot. There were four tickets on the windshield totaling four hundred and four dollars.

269.     She immediately went to the Third Police District to ask if there was a record that her car had been courtesy towed. An officer (name unknown) told her that PECO or Philadelphia Gas Works might have done work on a house at 3rd and Bainbridge Streets and encouraged her to contact them directly. Plaintiff Smith called PECO, who could not confirm the company had done work on the street but gave her the names of seven towing companies it contracted with for vehicle tows. Plaintiff Smith called all seven towing companies, and none had a record of her vehicle tow. Plaintiff Smith then called Philadelphia Gas Works, who denied that the company had done any work where she had originally parked.

270.     A few days later, Plaintiff Smith went to PPA's office to appeal her parking tickets. There, she was told to fill out paperwork and place it in a mailbox outside. Plaintiff Smith did as she was told.

271.     After several weeks, Plaintiff Smith had not heard from PPA regarding her appealed parking tickets. Therefore, in or around April of 2022, she placed a second appeal request in the same designated PPA mailbox.

272.     Several days later, PPA informed her that she had missed her administrative appeal deadline (during the period when PPA failed to respond to her first appeal submission), and that she would need to appeal her tickets to the Philadelphia Court of Common Pleas.

273.    On April 4, 2022, Plaintiff Smith sold her car because she never wanted to be courtesy towed again.

274.    Plaintiff Smith intends to appeal her parking tickets to the Philadelphia Court of Common Pleas.

**Plaintiff Dan Tran**

275.    Plaintiff Dan Tran is an attorney who lived at the 200 block of South 18th Street in Philadelphia, Pennsylvania 19103.

276.    He owned a 2016 Range Rover Sport HSE at all times relevant for this Complaint that he used to commute to work and to complete other daily tasks.

277.    On March 6, 2022, around 11:37 p.m., he parked his Range Rover on or around 18th Street between Delancey and Spruce Street in Philadelphia.

278.    Plaintiff Tran had a proper Zone 1 parking permit for that Zone 1 street parking at all relevant times.

279.    When Plaintiff Tran parked his Range Rover on March 6, 2022, no signs or other indications existed that parking was temporarily not permitted in that location if a vehicle had a Zone 1 Permit.

280.    Two days later, however, on March 8, 2022, at 6:00 p.m., when he returned to the location to use his vehicle, it was gone.

281.    Temporary "No Parking Signs" made of white paper and filled in with black marker were tied to nearby trees. The signs lacked any information regarding where cars had been towed or who to contact to locate the disappeared vehicles.

282.    The City of Philadelphia designed, printed, distributed, issued, permitted, and/or authorized the temporary no parking signs.

283.    The City also permitted and granted the authority to move his vehicle or moved the vehicle itself with or through PPD officers.

284.    Plaintiff Tran called the PPA, but PPA told him it did not have a record and to call the PPD. Plaintiff Tran called the PPD, but it also had no record of the tow.

285.    Plaintiff Tran then called private tow companies George Smith Towing and Lew Blum to ask about his vehicle's location, but they had no record of where his vehicle was relocated. Both tow company phone operators stated that the companies must get permission before towing and would have a record if they had towed the car. The tow operators advised Plaintiff Tran to call PPD and PPA because this situation occurs often and is a known problem that the City and PPA "relocate" vehicles.

286.    PPA only relocates vehicles under the direction instruction and authorization of PPD.

287.    The tow operators also stated that PPA and PPD vehicle relocations often result in disappeared vehicles ending up near Washington Avenue or Grays Ferry, despite an informal rule of towing vehicles within a six-block radius. The operators advised Plaintiff Tran to check those areas for his Range Rover.

288.    Still unable to find his vehicle, Plaintiff Tran called PPD and PPA again, but was told that no record existed for his vehicle.

289.    Plaintiff Tran then reported his vehicle as stolen. Responding officers came to the location of 18th Street between Delancey Street and Spruce Street. The responding officer told Plaintiff Tran that this situation of vehicle relocations happens all the time and that there was nothing the officer could do except keep his eye out for the vehicle.

290.    A few hours later, a PPD officer called Plaintiff Tran and told him that his vehicle had been located. Police drove to and picked up Plaintiff Dan Tran and drove him to the area of Bainbridge and 18th Street in Philadelphia. Residents at that location had called the Police as they noticed that a vehicle not normally parked on a local street had strangely appeared. This courtesy call was how PPD had located the vehicle.

291.    Plaintiff Tran recovered his vehicle at the Bainbridge and 18th Street location. Police Officers at the location told Plaintiff Tran that the vehicle had been relocated there, even though there had been no record of the tow.

292.    Officers also told Plaintiff Tran that because the vehicle had been reported as stolen, Plaintiff Dan Tran had to now get new license plates, registration, and title. This cost Plaintiff around an estimated $100-$300 dollars.

293.    The City of Philadelphia relocated Plaintiff Tran's vehicle using PPD Tow Squad, PPA tow truck operators, and/or other tow truck operators acting under color of state law granted by the City of Philadelphia due to the Streets Department issuance of a permit and acceptance of payment for that permit and the distribution by PPD of a Temporary No Parking Sign to the permit holder.

294.    The City of Philadelphia took inadequate steps to track which vehicles were towed or where vehicles were towed to.  Defendant also provided inadequate notice to Plaintiff Tran that his property had been taken and hidden from him.

295. Due to the City's Relocation Program and practices, Plaintiff Tran spent around six to eight hours looking for his vehicle that had been relocated in addition to the subsequent time and cost to replace the license plate, registration, and title.

296.    Furthermore, multiple Philadelphia police officers used valuable time looking for Plaintiff Tran's vehicle, filing an incorrect stolen vehicle report, and searching for a "stolen" vehicle that had actually been relocated.

297.    As a result of Defendant's Vehicle Relocation Program, Plaintiff Tran suffered an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of his vehicle without due process. He also suffered economic injuries.

**Plaintiff Austen Travis**

298.    Plaintiff Austen Travis owns a 2019 Toyota Corolla with his wife, and he uses the car to commute to work in New Jersey multiple days each week.

299.    On October 17, 2022, Plaintiff Travis parked his Toyota between 5th and 6th Street on Dickinson Street in Philadelphia around 5:30 p.m. He saw no signs or other warnings that the area had any temporary parking restrictions.

300.    The next day, around 5:15 pm, his vehicle had disappeared.

301.    At that time, Plaintiff Travis noticed that construction was happening on Dickinson Street and suspected his vehicle had been courtesy towed. Plaintiff Travis was familiar with courtesy towing because he had already been courtesy towed once before.

302.    Plaintiff Travis walked the area looking for any clues of where his vehicle had been taken. He saw a crumpled-up and partially ripped "Temporary No Parking" paper sign on the ground about midway down the block, between 5th Street and 6th Street that looked as if it had been previously taped to an object. He found a similar "Temporary No Parking" paper sign on a pole close to the 5th street side of Dickinson. The single posted sign was located at the other end of the block from where his vehicle had been parked and was not at the specific location where he had parked.

{00236410 }                                    50

303.    The City designed, printed, distributed, issued, permitted, and/or authorized the signs and the City had permitted the temporary no parking designation.

304.    Based on his prior experience of being courtesy towed due to the City of Philadelphia's Vehicle Relocation Program, Plaintiff Travis suspected the City of Philadelphia was again responsible for moving and relocating his vehicle, rather than his vehicle being stolen. He therefore started walking the surrounding blocks looking for his property. Eventually, he found his vehicle in a new parking spot, confirming that his vehicle had been relocated.

305.    Defendant is responsible for the deprivation of Plaintiff Travis' property without due process by permitting and authorizing the temporary no parking permit, designing, printing, distributing, issuing, permitting, and/or authorizing the use of the "Temporary No Parking" signs used for the City based construction project, and relocating Plaintiff Travis' vehicle through PPA, PPD, a City contracted tower, or a private tower acting under color of state law. As a result, Plaintiff Travis suffered an unreasonable and arbitrary deprivation of his possessory interests in and access to and use of his vehicle without due process.

**Plaintiff Matthias Wagman**

306.    Plaintiff Wagman owns a 1996 Nissan Maxima. At all times relevant to this Complaint, he has held the vehicle's power of attorney, been an authorized driver under the vehicle's insurance policy, and been its sole operator. His parents gifted him the car but are the registered owners.

307.    Plaintiff Wagman is a traveling nurse, and his job requires him to be out of the City for days and weeks at a time. Nevertheless, while he is in the City, Plaintiff Wagman checks on his car to make sure it is always where he parked it.

308.    In or around July 2021, Plaintiff Wagman, who has a Zone 1 parking permit, parked his car in a legal Zone 1 spot near his apartment on 15th Street. He checked on his car throughout the week.

309.    On July 29, 2021, Plaintiff Wagman received a letter from the City, stating his vehicle was parked in a metered parking spot at 13th and South Streets, and that he had seven unpaid parking tickets. Realizing his car had been courtesy towed, Plaintiff Wagman immediately went to 13th and South Streets to retrieve his vehicle.

310.    Plaintiff Wagman appealed the seven parking tickets he received. He was denied at every stage of the appeal process.

311.    In or around January 2022, having exhausted his administrative appeals, Plaintiff Wagman appealed his case to the Philadelphia Court of Common Pleas.

312.    On November 30, 2022, Plaintiff Wagman attended a scheduled hearing before Judge Ann Marie B. Coyle, Jr. ("Judge Coyle") in the Philadelphia Court of Common Pleas. Judge Coyle informed Plaintiff Wagman that because he had no written proof that his vehicle had been courtesy towed, he was responsible for paying the parking tickets—notwithstanding the fact that the City has no means by which a vehicle owner or operator can obtain written proof that his vehicle has been courtesy towed.

313.    On December 2, 2022, Judge Coyle issued an order denying Plaintiff Wagman's appeal.

314.    After Judge Coyle's December 2, 2022 order, Plaintiff Wagman paid eight hundred and eight dollars in tickets resulting from the courtesy tow.

## CLASS ACTION ALLEGATIONS

315.    Plaintiffs seek to represent a Class pursuant to Fed. R. Civ. P. Rule 23 (b)(2) and

Fed. R. Civ. P. 23(b)(3), defined as follows:

> All persons who, within two years before the filing of the complaint in
> *Eastman v. City of Philadelphia*, 2:21-cv-02248 (May 17, 2021) up to and
> including the date of class certification, had their vehicles relocated by the City
> of Philadelphia under the Relocation Program (the "Class").

316.    The members of the Class are so numerous and geographically dispersed that the

joinder of all members is impractical. While the exact number of people affected is unknown,

Plaintiffs believe that Class may number in the thousands.

317.    The common questions include:

    a.    Whether the City engaged in the conduct alleged herein, and in particular
the failure to provide adequate notice of towing, location of vehicles
towed, removal to locations where parking was not permitted, and not
removing vehicles from "stolen vehicle" databases;

    b.    Whether Plaintiffs' and the Class members' rights were violated;

    c.    Whether Plaintiffs and the Class members are entitled to money damages
and the measure of damages; and

    d.    Whether Plaintiffs' and the Class members are entitled to injunctive or
declaratory relief.

318.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all

Class members were affected by Defendant's conduct described above and assert the same claims

for monetary and equitable relief.

319.    Plaintiffs and their counsel will fairly and adequately represent the interests of the

Class members. Plaintiffs have no interest antagonistic to, or in conflict with, the interests of the

Class members. Plaintiffs' attorneys are experienced in the prosecution of class action and civil

rights litigation.

320.    Class certification under Rule 23(b)(2) is appropriate because the Defendant acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

321.    Class certification under Rule 23(b)(3) is appropriate because Defendant has injured and harmed the Class in the same manner, through the same conduct, and questions of law or fact common to the Class members predominate over any questions affecting the individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I
## Violation of the Fourteenth Amendment
## 42 U.S.C. § 1983

322.    Plaintiffs incorporate paragraphs 1 through 90 as though fully set forth herein.

323.    The use and enjoyment of one's vehicle (whether one owns or is an operator of such vehicle) is a property right protected by the Due Process Clause of the Fourteenth Amendment.

324.    The City has violated the Fourteenth Amendment due process rights of Plaintiffs and the Class members through the Relocation Program in the following ways:

    a.    The Relocation Program, as a matter of policy, practice, and custom, fails to provide adequate post-deprivation notice to those whose legally parked vehicles are towed;

    b.    The Relocation Program, as a matter of policy, practice, and custom, fails to employ reasonably practicable, available procedures to maintain records of relocated vehicles and fails to inform owners or operators of the whereabouts of their vehicles, thereby depriving owners and operators of any adequate post-deprivation process;

    c.    The Relocation Program, as a matter of policy, practice, and custom, fails to provide sufficient safeguards for owners or operators whose vehicles have been towed from legal spaces to spaces that are or become illegal

spaces, time limited spaces, or metered spaces and who then are cited for parking infractions and/or have their vehicles impounded;

d.    The Relocation Program, as a matter of policy, practice, and custom, fails to provide adequate safeguards against improper listing of towed vehicles as stolen; and

e.    The Relocation Program, as a matter of policy, practice, and custom, fails to train City personnel, including PPD, on how to maintain records of vehicle relocations and respond to reports from vehicle owners and operators that a vehicle has been relocated.

### COUNT II
### Violation of the Fourth Amendment
### 42 U.S.C. § 1983

325.    Plaintiffs incorporate the allegations of paragraphs 1-93, as though fully set forth herein.

326.    The City has violated the Fourth Amendment rights of the Plaintiffs and the Class members because the Relocation Program, as a matter of policy, practice, and custom, results in the unreasonable seizure and displacement of their vehicles in the absence of any wrongdoing on their part and in the absence of adequate safeguards to protect against arbitrary loss of possession, use, and enjoyment of the vehicles that have been relocated.

### PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiffs respectfully seek relief in the form of:

A.    certification of the Class defined above under Fed. R. Civ. P. 23(b)(2);

B.    declaratory and injunctive relief for Plaintiffs and the Class;

C.    certification of the Class defined above under Fed. R. Civ. P. 23(b)(3);

C.    compensatory damages for Plaintiffs and the Class;

D.    an award of attorneys' fees and cost of suit; and

E.      any further or other relief that the Court deems just and appropriate.

Dated: February 9, 2023

/s/ *Elias A. Kohn*

Joseph C. Kohn (PA # 36565)
William E. Hoese (PA # 41787)
Aarthi Manohar (PA # 318874)
Elias A. Kohn (PA # 327743)
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700

David Rudovsky
Susan M. Lin
**KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN, LLP**
718 Arch Street, Suite 501S
Philadelphia, PA 19106
Telephone: (215) 925-4400

*Attorneys for Plaintiffs and the Class*