**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MACKENZIE SMITH,** *et al.,* | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | **NO. 22-5092** |
| | : | |
| **THE CITY OF PHILADELPHIA,** | : | |
| | : | |
| *Defendant.* | : | |

<u>**MEMORANDUM OPINION**</u>

Goldberg, J.                                                                                          February 3, 2025

Plaintiffs[1] bring this action against Defendant, the City of Philadelphia (the "City"), in connection with the City's "vehicle relocation" or "courtesy towing" program. Under this practice, Plaintiffs allege that cars legally parked are relocated without adequate pre- or post- notice, oftentimes to illegal and/or unknown spots resulting in Plaintiffs, and others similarly situated, being unable to locate their vehicles and suffering related consequences. Plaintiffs bring this putative class action asserting claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments.

The City has filed a Motion to Dismiss alleging both lack of jurisdiction and failure to state a claim upon which relief may be granted. For the following reasons, I will deny the Motion in its entirety.

## I.    FACTUAL ALLEGATIONS

The following facts are alleged in the Amended Complaint. The City denies many of the allegations in the Complaint, but in deciding a motion under Federal Rule of Civil Procedure 12(b), I

---

[1] "Plaintiffs" includes fifteen individuals suing on behalf of themselves and proposed unnamed class members. Named plaintiffs are: Robert Clendaniel, Jonathan Dilliplane, Danielle Ditommaso, Graham Foley, Benjamin Grossman, Megan Heckert, Allen Rue, Jr., Jason Jennings, Kelly Larson, Mackenzie Smith, Michael Smith, Rhoda Smith, Daniel Tran, Austen Travis, and Matthias Wagman.

must accept all factual allegations in the complaint as true, and construe the complaint in the light most favorable to the plaintiff.[2]

### A. <u>General Allegations Alleged in the Complaint about the Courtesy Towing Program</u>

According to Plaintiffs, the City has a patchwork of practices, policies, and procedures, written and unwritten, which collectively authorize the City, its agents, and employees, to relocate private vehicles legally parked on the City's streets without adequate prior or post-tow notice to the vehicle's owner or operator. It is alleged that under this "Relocation Program," sometimes referred to as "courtesy towing," the City and its agents remove cars from legal spots to secondary locations, which are often illegal, metered, or timed spaces, thus causing the owners to accrue tickets and parking fines. (Am. Compl. ¶¶ 2–3.)

Plaintiffs assert that the City courtesy tows vehicles in three primary ways: (1) by or at the behest of the Philadelphia Police Department ("PPD"), (2) by a private towing company under contract with the City, or (3) by a private tow operator pursuant to City-issued temporary no parking sign. (Id. ¶ 28.)

First, PPD's "Tow Squad" may designate specific vehicles to be towed and relocate them or direct the Philadelphia Parking Authority or a private tow operator to do so. Second, the City may designate a location as not permitted for parking and authorizes a city-contracted tow operator to relocate the vehicles in the area.[3] Finally, the City may grant a temporary no parking permit to an individual. Under that alleged practice an applicant seeking a "Temporary No Parking" permit applies on the City's website, and, if granted, payment is to be delivered to the City and the permit is issued. The applicant then takes the permit to the assigned local Philadelphia Police district to obtain official "Temporary No Parking Signs." As alleged, the permit holder may contact PPD or a private third-party to relocate vehicles parked in the temporary no parking spaces. (Id. ¶ 28, 32.)

---

[2]    Ultimately I must determine if under any reasonable reading, the plaintiff may be entitled to relief. Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

[3]    This may be done to create space for moving trucks, storage containers, temporary dumpsters, restaurant seating, loading areas, construction projects, film crews. Additionally, the Streets Department may authorize towing for milling, paving, or other roadway restoration projects. (Id. ¶¶ 29–31.)

According to the Complaint, the Relocation Program does not provide sufficient pre- or post-tow notice to vehicle owners or operators; the "No Parking" signs at issue fail to provide notice to owners that their vehicles were towed, where the vehicle was taken, or whom to contact; and the City does not monitor where these signs are posted or if they are in fact posted before a relocation tow. (Id. ¶¶ 33–34.) There is allegedly no policy or procedure requiring a tow operator to relocate a vehicle to a designated lot or parking space, nor does the City do tell the Parking Authority not to ticket or impound a vehicle that has been relocated to a metered or zoned spot. Plaintiffs claim that the City's actions not only render them unable to find their cars after courtesy tows but result in tickets and fines to be accrued in the new spot. The City's alleged failure to adequately track or record vehicle relocations results in the Parking Authority routinely denying challenges to the tickets resulting from courtesy tows. (Id. ¶¶ 35–38.)

Plaintiffs assert that even though the City can readily determine a vehicle owner's address by looking up a vehicle's license plate, and even though this protocol is already in place for vehicle owners whose cars are impounded for City Code violations, the City fails to provide adequate post-tow notice. Plaintiffs are not aware of any City Department that maintains records or a centralized repository related to vehicle relocations nor are they aware of any City training or directive for PPD about what to tell vehicle owners and operators who call about courtesy tows. According to them any "tow log" retained by PPD is inaccurate and incomplete as private tow owners are not required to provide accurate information for the PPD tow log. When the named Plaintiffs contacted PPD they were generally unable to locate courtesy towed vehicles in the tow log, and PPD in some cases encouraged them to report their cars as stolen. Plaintiffs that reported their cars stolen and later informed the City after locating their cars, nonetheless where stopped by the police for driving their own "stolen" cars, allegedly as a result of the PPD failure to remove the found vehicle from the stolen vehicle database. (Id. ¶¶ 39–47.)

**B.  The Individual Plaintiffs**

The following facts are alleged by Plaintiffs and are accepted as true for the purposes of this motion. In addition to the allegations of the named Plaintiffs, Plaintiffs also alleged that unnamed plaintiffs experienced similar interactions with the City.

    1.  Robert Clendaniel

On October 30, 2022, Plaintiff Clendaniel parked his car at 1014 Pine Street near his apartment. On November 5, 2022, after finding that his car was not where he left it, Clendaniel searched the area for approximately two hours, before calling 911 to report his car stolen. (Id. ¶¶ 100–01.) The officer who arrived told Clendaniel that the car had likely been relocated, but there was no record of such a tow. On November 8, 2022, Clendaniel filed a stolen car claim with his insurance company. (Id. ¶¶ 100–05.)

On November 10, 2022, PPD Detective Hammond called Clendaniel to tell him his car had been found on the 1400 Block of Water Street, over a mile from where it was parked. Although Clendaniel immediately went to that area, he could not locate his car. He called Detective Hammond who informed him that, in the interim, the car had been towed by a private towing company to its company lot. Once at the tow lot, Clendaniel was told that he needed a "police release form" which could only be obtained by physically going to PPD. On his way out of the tow lot, Clendaniel fell and was taken by ambulance to the hospital with a dislocated knee. (Id. ¶ 108.) Clendaniel ultimately paid a $141 fine for the release of his car. (Id. ¶¶ 107–10.)

    2.  Plaintiff Jonathan Dilliplane

In late August 2022, Plaintiff Jonathon Dilliplane parked his car on Spruce Street, between 20th and 21st Streets in Philadelphia and checked on his car almost every day to ensure there were no Temporary No Parking signs. (Id. ¶¶ 111–13.)

On September 2, 2022, Dilliplane discovered a sign—but not an official City sign—strung to a tree about three to five car lengths from his Honda. According to the sign, the City had granted the resident authorization to use this particular sign because it had run out of Temporary No Parking signs.

Dilliplane concluded that the sign applied only to the immediate area and not further down the block because it was for a moving vehicle. The next morning, on his way to work, Dilliplane noticed that his car was gone. (Id. ¶¶ 114–17.)

Dilliplane called the Ninth District of the PPD and officers told him his car was relocated to an unknown location but they did not know where. They directed him to report the car stolen and, if his car was found, officers would call him. About two and half hours later, a police officer called Dilliplane and indicated the car was in a Parking Authority lot. Dilliplane hired an Uber to go recover his vehicle and ultimately paid $250 to retrieve his car. (Id. ¶¶ 118-19, 124.)

Dilliplane then claims to have learned that PPD had gone to the location where his vehicle was parked, issued parking tickets, and instructed the Parking Authority to tow specific vehicles that PPD determined necessary to effectuate the City's temporary no parking permit for the resident who was moving. (Id. ¶ 125.) Even though Dilliplane was present in his home and lived on the street where his vehicle was parked, he asserts no officer knocked on his door. Dilliplane ultimately spent over $500 in parking tickets, fines, fees, and Ubers to recover his vehicle. (Id. ¶¶ 125–26, 129–130.)

3.  Plaintiff Danielle Ditommaso

On August 28, 2022, Plaintiff Danielle Ditommaso parked her 2013 Volkswagen Jetta near her residence of 2200 Ben Franklin Parkway, but when she returned on August 30, 2022, her car was gone. In the nearby area, she saw "Temporary No Parking Signs" but claims they were not at the specific location where she parked. When she was later unable to find her car she called the PPD's Ninth District and was told, based on where her car was parked, that it had been "relocated" because Police were moving vehicles to make way for a music festival. The Ninth District had no more information but suggested she call the next day because her car was "not in the system" yet. (Id. ¶¶ 132–140.)

The next day, the PPD informed her that her car was still not in the system and she should "walk around" to look for her car. (Id. ¶ 141.) The Officers also gave Ditommaso the phone number of multiple

private tow operators with whom the City works. (Id. ¶ 142.) None of these private tow operators knew anything about her vehicle. (Id. ¶ 143.)

She spent the next few weeks looking for her car. About a month later, Ditommaso again called the Ninth District and was told that her vehicle was taken to Fairmount Park on West Sedgley Avenue. When she went to that location, the car was not there. (Id. ¶¶ 146–47.)

At this point, Ditomasso reported to the PPD that her car was stolen by the City, but the PPD Incident Report states that her vehicle was relocated. Although she filed a claim with the City for her lost vehicle, to date, she has yet to locate her car. (Id. ¶¶ 148–52.)

4.  Plaintiff Graham Foley

Just after midnight on June 22, 2022, Plaintiff Foley parked his 2004 Honda Civic in an allegedly legal parking spot on the 1900 block of Reed Street. The spot was in a two-hour parking zone, but the restriction did not begin until 8:00 a.m. At approximately 8:30 that same morning, Foley went to repark his car but found it was not there and that several "Temporary No Parking" signs had allegedly appeared overnight. (Id. ¶¶ 158–62.)

Foley immediately called the Seventeenth Police District to ask about his car, but nobody answered the phone. Approximately twenty-five minutes later, Foley went to the Seventeenth Police District in person, but neither the desk officer nor another officer could find anything in the PPD tow log. At the officers' encouragement, Foley called the Parking Authority, which directed him to call several Parking Authority impoundment lots. Foley ultimately located his car at the Parking Authority impoundment lot at Weccacoe Avenue, where he was required to pay a $175 fine to get his vehicle released. (Id. ¶¶ 163–68.)

Foley appealed the fine at the direction of a Parking Authority agent. Approximately one week later, Foley called the Seventeenth Police District to explain that he had legally parked his car prior to any "Temporary No Parking" signs being put up, and to note that PPD issued and placed those signs overnight. When Foley asked if PPD maintained records of temporary no parking zones throughout the

City, the officer allegedly responded, "[t]his is a big City, and there's a lot going on. We don't keep records of all temporary no parking zones." (Id. ¶¶ 169–72.)

In August 2022, Foley received a letter from the Parking Authority denying the appeal of his $175 fine and stating that he was now responsible for paying an additional fine for his alleged parking infraction. A week later, Foley called the Parking Authority and was told that the Parking Authority could not discharge his tickets and fines due to a new late fee. Ultimately, Foley paid $175 on top of the $175 he had already paid. (Id. ¶¶ 173–75.)

5.   Plaintiff Benjamin Grossman

Plaintiff Benjamin Grossman parked his 2003 Hyundai Elantra on Pennsylvania Avenue between 27th and 28th Street in Philadelphia. The parking location was allegedly legal with no restrictions or permit requirements. He checked on his car in early July 2022. (Id.). Around July 28, 2022, Grossman's car went missing. (Id. ¶¶ 179–80.)

Neither the Parking Authority nor private tow operators had any record of his vehicle. (Id. ¶ 182.) When he was unable to locate the vehicle, he called the PPD's Ninth District to report the vehicle as stolen, but the Officer told Grossman that his vehicle had almost certainly been relocated because maintenance/utility work had been occurring at that location at that time. The officer believed it was likely that the car was somewhere near Girard College, but Grossman could not find his vehicle there. After spending weeks looking for his car, Grossman called the PPD again and was instructed to look for his car in a different area, with no success. Ultimately, on January 17, 2023, he filed a stolen vehicle report, and, to date, his car is still missing. (Id. ¶¶ 182–89.)

6.   Plaintiffs Megan Heckert and Allen Rue, Jr.

In August 2022, Plaintiffs Megan Hecker and Allen Rue parked their 2007 Honda Fit in an allegedly legal spot on the 2100 block of Arch Street. On the afternoon of September 18, 2022, Heckert and Rue returned to find their car missing. They searched for the car in Philadelphia's Lemon Hill Park

and ultimately found it a mile and a half from where it was parked. The car had a "complaint or incident" report on the windshield, indicating the car had been towed at 4:30 a.m. that day. (Id. ¶¶ 190–94.)

On the way home, the car made a groaning noise, and the check oil light came on. (Id. ¶ 195.) Rue immediately took the car for service, and the mechanic indicated that the towing hook had been misapplied, resulting in the car being undriveable and requiring a new engine worth $6,000. On September 22, 2022, Hecker and Rue filed a claim with City's Office of Risk Management, but when they tried to follow up on that claim in November 2022, they were informed that the City had no record of it. Heckert forwarded a copy via email. (Id. ¶ 201.) On December 28, 2022, Heckert again requested a status updated, but the City employee informed her that the case had not yet been assigned to an adjuster. To date, the City has failed to resolve this claim and Heckert and Rue spent over $6,000 to repair their vehicle. (Id. ¶¶ 195–209.)

7. Plaintiff Jason Jennings

On September 11, 2022, at approximately 10:00 p.m., Plaintiff Jason Jennings parked his car in an allegedly legal parking space on the 2100 block of Spruce Street near his home. The following morning, on September 12, 2022, at 6:45 a.m., Jennings returned to his car to find it missing. After searching for his car, Jennings called both the Parking Authority and the Ninth District PPD, neither of had any record of the car. Jennings made several additional calls both the towing company and the Ninth District, to no avail. (Id. ¶¶ 209–18.)

Over the next few days, Jennings used ride services or walked to work and took a half day off work to search areas recommended by the PPD. Jennings then recontacted the Ninth District and reported his car stolen. On September 16, 2022, an officer called Jennings and told him the car was found at 22nd and Market Street. When Jennings found the car, there were four hundred dollars' worth of tickets on the windshield. (Id. ¶ 225.) Jennings' appeal was denied, and, as a result, Jennings is now unable to obtain a parking permit. (Id. ¶ 229.)

8.  Plaintiff Kelly Larson

Around October 29, 2022, Plaintiff Kelly Larson parked her 2012 Toyota Corolla on Lombard Street between Broad and 15th Streets, but when she returned to her vehicle on November 11, 2022 at 7:00 a.m., the car was gone. The location had "Temporary No Parking Signs" and construction work was occurring. (Id. ¶ 233–36.)

Larson found no information in the Parking Authority database, so she called the Parking Authority parking violation number and was placed in an automated queue. Although the system indicated a seven to ten minute wait time, she remained in the queue until she manually left it almost eleven hours later at 5:45 p.m. Larson then paid for an Uber to a Parking Authority impound lot to look for her vehicle, but an employee told her it was not there. She paid for another Uber to return home and go to work, after which she biked around the area to look for her car. She also called two police districts and various tow companies, one of which was able to help her locate her car. (Id. ¶¶ 37–43.)

9.  Plaintiffs Mackenzie and Michael Smith

In March 2022, Plaintiff Mackenzie Smith drove home from work and parked her Honda Civic in an allegedly legal parking spot with no time limitations at the intersection of Corinthian and Poplar Streets. Approximately one week later, she returned to that location but could not find her car. A Ninth District Police Officer stated that there was no record that her vehicle had been towed. She then searched for her car for an hour and a half and contacted three local private towing companies. Ultimately, she called the PPD and reported her vehicle stolen. (Id. ¶¶ 248–53.)

In late March 2022, Smith reported the theft to the insurance company, during which time she paid for car rental and ride services to travel to and from work. On March 30, 2022, Smith's father, Michael Smith, purchased a used Subaru Forrester for Smith, the amount of which was only partially covered by the insurance company. (Id. ¶¶ 254–56.)

On April 18, 2022, Smith received a voicemail from a PPD Officer Morton indicating that the Honda Civic had been found, approximately one-third of a mile from where she had originally parked it,

with multiple tickets on the windshield, and that she had fifteen minutes to reclaim the vehicle before it was towed again. She called back immediately and stated that she was out of town and could not get to the vehicle in fifteen minutes, but Officer Morton nonetheless authorized the tow of the Honda to a lot at 3200 S. 61st Street. (Id. ¶¶ 257–58.)

Michael Smith called the family's insurance agent to report recovery of the Civic, but the agent stated that because the vehicle was now the property of the insurance company, the family could not retrieve the car from the tow lot, remove any personal belongings, or collect the parking tickets. (Id. ¶ 260.) In the ensuing months, Michael Smith received letters from the Philadelphia Parking Violations Branch regarding his delinquency in paying the tickets on the Honda Civic, all of which were received in the spot to which the Honda had been towed. (Id. ¶ 260.) Because the Ninth District did not have the stolen vehicle report, appeals of the tickets were denied. (Id. ¶¶ 260–63.)

10. Plaintiff Rhoda Smith

On February 9, 2022, Plaintiff Rhoda Smith parked her 2015 Chevrolet Cruze in an allegedly legal parking spot at 3rd and Bainbridge Streets. She left for Florida the next day, and, when she returned eleven days later, she found her car missing. After searching for forty-five minutes, she found her vehicle parked up the block with four tickets totaling four hundred and four dollars. She went to the Third Police District, and an officer encouraged her to contact PECO or Philadelphia Gas Works who may have been doing work on the street. Neither PECO, Philadelphia Gas Works, nor any of the seven towing companies she called had a record of her vehicle tow. (Id. ¶¶ 265–269.)

Several days later, Plaintiff went to the Parking Authority to file an appeal of her parking tickets. After not hearing anything for several weeks, she filed a second appeal. A few days thereafter, the Parking Authority informed her that she had missed her administrative appeal deadline (during the period when the Parking Authority failed to respond to her first appeal submission), and that she would need to appeal her tickets to the Philadelphia Court of Common Pleas. (Id. ¶¶ 270–72.)

11. <u>Plaintiff Dan Tran</u>

On March 6, 2022 around 11:37 p.m., Plaintiff Dan Tran parked his Range Rover on 18th Street between Delancey and Spruce Streets. He alleges that there were no signs or other indications that parking was not permitted. Two days later, however, Tran returned to find that his vehicle was gone and that there were Temporary "No Parking Signs" made of white paper and black marker, and issued by the City, tied to nearby trees. Tran called the Parking Authority, the PPD, and two private towing companies, none of which had record of the tow. (<u>Id.</u> ¶¶ 277–85.)

After searching the nearby area for his vehicle, Tran reported the car as stolen. When responding officers came to the location, they allegedly told Tran that vehicle relocations happen all the time and that there was nothing they could do. A few hours later, a PPD officer called Tran and told him that residents at 18th and Bainbridge reported a strange vehicle—which turned out to be Tran's—parked on a local street. The officer told Tran that because the vehicle had been reported as stolen, he now needed new license plates, registration, and title, at a cost of $100-$300. (<u>Id.</u> ¶¶ 289– 92.)

12. <u>Plaintiff Austen Travis</u>

On October 17, 2022 at around 5:30 p.m., Plaintiff Austen Travis parked his 2019 Toyota Corolla between 5th and 6th Streets on Dickinson Street. He alleges there were no signs or warnings regarding temporary parking restrictions. The next day, around 5:15 p.m., his vehicle disappeared, and Travis noticed construction on Dickinson Street. Having dealt with courtesy towing before, Travis walked the area and noted a "crumpled-up and partially ripped" Temporary No Parking paper sign midway down the block. He found a similar sign on a pole close to the 5th Street side of Dickinson, which was the other end of the block from where his vehicle had been parked. Eventually, Travis found his vehicle in a new parking spot. (<u>Id.</u> ¶¶ 299–304.)

13. <u>Plaintiff Matthias Wagman</u>

In July 2021, Plaintiff Matthias Wagman parked his car near his apartment on 15th Street and checked on his car throughout the week. On July 29, 2021, Wagman received a letter from the City stating that his vehicle was parked in a metered parking spot at 13th and South Streets and that he had seven unpaid parking tickets. Realizing his car had been courtesy towed, he went to that area to retrieve his vehicle. (<u>Id.</u> ¶¶ 308–09.)

Wagman appealed the seven parking tickets and was denied at every stage of the appeal. In January 2022, he appealed his case to the Philadelphia Court of Common Pleas and attended a scheduled hearing on November 30, 2022. The judge informed Wagman that because he had no written proof of the courtesy tow, he was responsible for the parking tickets. Wagman ended up paying $808 dollars in tickets resulting from the courtesy tow. (<u>Id.</u> ¶¶ 310–14.)

## II.    STANDARDS OF REVIEW

### A.  <u>Rule 12(b)(1)</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case. <u>Petruska v. Gannon Univ.</u>, 462 F.3d 294, 302 (3d Cir. 2006). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." <u>Id.</u> at 302 n.3 (quotation omitted).

There are two types of Rule 12(b)(1) motions. A "facial" attack assumes that the allegations of the complaint are true but contends that the pleadings fail to present an action within the court's jurisdiction. <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977). A "factual" attack, on the other hand, argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, causing the case to fall outside the court's jurisdiction. <u>Mortensen</u>, 549 F.2d at 891. In such a case, "no presumptive truthfulness attaches to plaintiff's allegations" and the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue. <u>Id.</u> With a factual attack, the Court is free to consider evidence

outside the pleadings and weigh that evidence. <u>Petruska</u>, 462 F.3d at 302 n.3; <u>see also</u> <u>Gould Elecs., Inc.</u> <u>v. U.S.</u>, 220 F.3d 169, 176 (3d Cir. 2000). "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." <u>Petruska</u>, 462 F.3d at 302 n.3 (quoting <u>Mortenson</u>, 549 F.2d at 891). I construe the City's motion as a facial attack as it claims that Plaintiffs do not allege sufficient facts to establish their standing.

### B. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); <u>see also</u> <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. <u>Id.</u>

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard. <u>Bistrian v. Levi</u>, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. <u>Id.</u> at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." <u>Id.</u> Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 679).

III.    **DISCUSSION**

Plaintiffs asserts that the City's policy, practice, and custom of relocating vehicles, without adequate safeguards against arbitrary towing, deprived them of their possessory interests in their vehicles in violation of the Fourth Amendment. Plaintiffs also allege that, by failing to provide Plaintiffs with adequate notice that their vehicles would be or had been towed, the City violated their Fourteenth Amendment due process rights.

The City seeks dismissal of Plaintiffs' § 1983 claims on two grounds. First, it asserts that, under Federal Rule of Civil Procedure 12(b)(1), the named Plaintiffs lack standing to pursue the claims for class-wide relief. Alternatively, it posits that, under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' § 1983 claims fail to state a plausible claim for relief.

**A.  <u>Standing</u>**

To establish Article III standing, a plaintiff must demonstrate (1) an injury-in-fact, (2) sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. <u>Finkelman v. National Football League</u>, 810 F.3d 187, 193 (3d Cir. 2016). Considering each of the three standing elements separately, I find that Plaintiffs have pled standing.

1.  <u>Injury-in-Fact</u>

The first element, injury-in-fact, requires a plaintiff to claim "the invasion of a concrete and particularized legally protected interest" resulting in harm "that is actual or imminent, not conjectural or hypothetical." <u>Id.</u> (quotation omitted). To be concrete, the injury must be "real, or distinct and palpable, as opposed to merely abstract." <u>Id.</u> (quotation omitted). To be sufficiently "particularized," an injury must "affect the plaintiff in a personal individual way." <u>Id.</u> (quotation omitted). A plaintiff relying on a "chain of contingencies" or "mere speculation" has not alleged injury-in-fact. Where a plaintiff alleges financial harm, standing "is often assumed without discussion." <u>Cottrell v. Alcon Labs.</u>, 874 F.3d 154, 163 (3d Cir. 2017) (quotation omitted).

The City contends that Plaintiffs' claims are insufficient to show injury-in-fact. It notes that Plaintiffs itemize five policies or practices that expose the City to liability for due process harms: (1) failure to provide adequate post-deprivation notice; (2) failure to maintain adequate records of relocated vehicles; (3) allowing relocated vehicles to accumulate tickets; (4) failing to provide adequate safeguards against improper listing of towed vehicles as stolen; and (5) failing to train City personnel including PPD, on how to maintain records of vehicle relocations and respond to reports from vehicle owners and operators that a vehicle has been relocated. Individually analyzing each of these five policies or practices,

The City then identifies how some or all of the Plaintiffs have not been harmed. For example, The City infers from several of the Amended Complaint's allegations that certain Plaintiffs parked in locations that may not have been actual legal spots at the point in time at which the vehicles were relocated. (Def.'s Mem. Supp. Mot. 13.) The City also claims that because some of the vehicles were located within hours of looking, those Plaintiffs cannot establish any harm. The City further asserts that there are available appellate process and procedures for the Plaintiffs to challenge their tickets and fines. Finally, The City questions how Plaintiffs have a property right in the "reported stolen" status of their vehicles or in the maintenance for records by the City.

The City's argument conflates a standing analysis with a challenge to the merits of Plaintiffs' claim. The United States Court of Appeals for the Third Circuit has emphasized that, "[i]n assessing whether a plaintiff has [established standing], we separate our standing inquiry from any assessment of the merits of the plaintiff's claim. To maintain this fundamental separation between standing and merits at the dismissal stage, we assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims." Cottrell, 874 F.3d at 162. Thus, although the standing inquiry may reference the "nature and source of the claim[s] asserted," the focus remains on "whether the plaintiff is the proper party to bring those claims." Id. (quotation omitted).

Each named Plaintiffs alleges that he or she is either the registered owner of the automobile in question or the primary operator of the vehicle. (Am. Comp. ¶¶ 96, 111, 133, 157, 178, 192, 208, 233,

247, 265, 276, 298, 306.) Such allegations are sufficient to plead a "particularized legally protected interest" in the vehicles. See Hyman v. Capital One Auto Finance, 306 F. Supp. 3d 756, 770 (W.D. Pa. 2018) (finding that a buyer of a car had possessory interest that invoked due process protections); Olarte v. Cywinski, No. 12-cv-632, 2012 WL 3757649, at *4 (M.D. Pa. Aug. 28, 2012) (holding that allegations that plaintiff was gifted a car and was the sole operator sufficient to plead that plaintiff had a possessory interest in the car); see also Snyder v. Daugherty, 899 F. Supp. 2d 391, 410 (W.D. Pa. 2012) ("This Court can discern no meaningful difference between a possessory interest in property for the purposes of the Fourteenth Amendment and a possessory interest in property for the purposes of the Fourth.")

Moreover, each Plaintiff has alleged an actual and sufficiently particularized injury-in-fact as a result of the courtesy towing of their vehicles:

- Robert Clendaniel was unable to locate his car for five days and, in the process, took time off from work, paid for ride share services, paid a fine for the release of his vehicle, and was physically injured at the private towing lot.

- Jonathan Dilliplane was deprived of his car for a day, took time off from work, hired an Uber to recover his vehicle, and paid over $500 in parking tickets, fees, fines, and ride shares.

- Danielle Ditommaso was permanently deprived of her vehicle as the City was never able to locate it.

- Graham Foley was deprived of his vehicle for a day and had to pay a $175 fine before he could retrieve his car

- Ben Grossman was permanently deprived of his car as the City was never able to locate it.

- Megan Heckert and Allen Rue were deprived of their car for part of the day, and, when they finally located it, found it had been extensively damaged by the towing service.

- Jason Jennings was deprived of his vehicle for several days, took time off of work to search for it, had to pay alternative staffing to cover his work absence, and paid $400 in parking tickets.

- Kelly Larson was deprived of her vehicle for a period of time, spent time calling towing companies and searching for her car, missed time from work, and paid Uber fees.

- Mackenzie and Michael Smith were deprived of the car for approximately a month, were given hundreds of dollars of parking tickets, and paid for a new vehicle during the time they believed the vehicle was stolen.

- Rhoda Smith had to search for her car for forty-five minutes and was given over $400 in parking tickets.

- Dan Tran was deprived of his vehicle for a period of time, spent six to eight hours looking for the vehicle, and, because he reported the vehicle as stolen, had to obtain new license plates, registration, and title.

- Austen Travis was deprived of his vehicle for a brief period of time.

- Matthias Wagman was issued seven parking tickets when his vehicle was relocated to a metered spot without his knowledge.

For purposes of the standing inquiry, it is thus sufficient that each Plaintiff has alleged that he or she was deprived even temporarily of his or her property, and that such deprivation resulted in some actual and sufficiently particularized harm. See Fuentes v. Shevin, 407 U.S. 67, 85 (1972) (holding that "temporary, nonfinal deprivation of property" is nonetheless a deprivation). While discovery may cast doubt on Plaintiffs' allegations, the standing inquiry requires that I assume the validity of Plaintiffs' claims. Doing so, I conclude that Plaintiffs have met their burden of alleging injury-in-fact.

2. Causation

The second element requires that the alleged injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Finkelman, 810 F.3d at 193. This requirement is "akin to 'but for' causation" in tort and may be satisfied "even where the conduct in question might not have been a proximate cause of the harm." Id. (quotation omitted). So long as there is a "fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," an "indirect causal relationship will suffice." Id. at 193—94 (quotation omitted). This is a relatively "low bar," and even harms that flow indirectly from the action in question meet the causation requirement for standing purposes. Richard Roe W.M. v. Devereux Found., No. 21-cv-2655, 2023 WL 173918, at *9 (E.D. Pa. Jan. 12, 2023).

The City argues that Plaintiffs cannot show that their alleged injuries were fairly traceable to the City and that several of the named Plaintiffs had their vehicles towed by the Parking Authority, which is an independent agency whose agents' actions are not attributable to the City.

17

I find that Plaintiffs have met the "low bar" of showing causal connection for purposes of standing. Plaintiffs plead that the City courtesy tows vehicles in three ways: (1) by or at the behest of the Philadelphia Police Department ("PPD"); (2) by a private towing company under contract with a City Department or responding to a direct City Department request; or (3) by a private tow operator enforcing a temporary no parking permit or temporary no parking signs issued by the City. (Id. ¶ 28.) Under any of these scenarios, the vehicle tows could be deemed to have been carried out by the city, either directly or indirectly.

First, to the extent the vehicles were towed by or at the direction of the PPD, those actions were done by the City, as the City does not dispute that the PPD is a municipal entity. While the tows in question may have been completed by the Parking Authority, the facts indicate that the Parking Authority was contacted by and acted under direction of the PPD. [4]

Second, to the extent the vehicles were towed by companies acting under contract with the City, the towing company is a state actor by virtue of maintaining an ongoing salvor relationship and contract with the City. Foster v. City of Phila, No. 12-cv-5851, 2014 WL 5821278, at *22 (E.D. Pa. Nov. 10, 2014). Here, the alleged facts reflect that towing companies act under express direction from the City, with the purpose of enforcing the City's traffic decisions. As such these tows contain a sufficient causal connection to the city.

Finally, to the extent the vehicles were towed by a private party pursuant to a temporary no parking sign, I find that Plaintiffs have sufficiently established a causal connection to the City. Here, Plaintiffs allege that private contractors and residents obtain and pay for official temporary no parking signs from the City, through the local police district. These temporary no parking signs contain the words "Temporary Police Regulation," "Vehicles Will be Towed," and "City of Philadelphia." Although the

---

[4]    The City emphasizes that the Parking Authority is an independent agency whose actions are not attributable to the City. The Amended Complaint acknowledges that the Parking Authority is an agency of the Commonwealth of Pennsylvania independent from the City of Philadelphia, but nonetheless pleads that the City uses Parking Authority tow truck operators to relocate vehicles where the Parking Authority responds to the City's requests and authorization to relocate vehicles. (Am. Compl. p. 6 n.1.)

private contractor may hire a private towing company to relocate the vehicle in a temporary no parking area, the contractor is only empowered to do so because of the actions of the City.

Plaintiffs further allege that as a result of these courtesy tows—whether done by the PPD itself, by the Parking Authority, or by private towing companies acting under the City's authority—Plaintiffs have suffered injuries fairly traceable to the City's challenged actions.

       3.  Redressability

The final element of standing requires that the injury be redressable. That is, the plaintiff must show that it is "likely, as opposed to merely speculative," that the alleged injury will be redressed by a favorable decision. Finkelman, 810 F.3d at 194.

Plaintiffs here seek injunctive relief regarding the alleged "unlawful interference with their Fourth Amendment possessory rights in relation to their vehicles" and lack "of adequate post-deprivation process in violation of the Due Process Clause of the Fourteenth Amendment." (Am. Comp. ¶ 49.) They contend the constitutional violations are ongoing, the Plaintiffs have suffered repeated instances of these violations, and unnamed class members will continue to suffer harm. (Id. ¶ 50.) Finally, Plaintiffs seek monetary damages resulting from the incurred fees and fines, loss of income from missed working hours spent searching for vehicles, expenses due to vehicles damaged during the relocation tow, and expenses related to car services and rentals used while the vehicles were missing. (Id. ¶ 51.) Such injuries are likely to be redressed by a favorable decision. Accordingly, I will deny The City's Motion to Dismiss based on standing.

**B.  Failure to State a Claim**

The City alternatively seeks dismissal of Plaintiffs' § 1983 claims on the grounds that they fail to state a claim on which relief may be granted. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress[.]

42 U.S.C. § 1983. The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002).

"[A] government entity may not be held vicariously liable under § 1983 for the acts of its employees under a *respondeat superior* theory of liability." Win & Son, Inc., 162 F. Supp. 3d 449, 459 (E.D. Pa. 2016) (citing Monell v. Dept. of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978)). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694; see also Mulholland v. Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986) (emphasis in original).

Here, Plaintiff asserts that the City's policy, practice, and custom of relocating vehicles, without adequate safeguards, deprived them of their possessory interests in their vehicles in violation of the Fourth Amendment. Plaintiffs also allege that, by failing to provide Plaintiffs with adequate notice that their vehicles would be or had been towed, the City violated their Fourteenth Amendment due process rights. The City responds by claiming that Plaintiffs' rights have not been violated and if they have they are not the result of the City's policy.

1. <u>Fourth Amendment Claim</u>

Under the Fourth Amendment, "[a] 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" <u>Soldal v. Cook Cnty.</u>, 506 U.S. 56, 61 (1992) (quotation omitted). "The impoundment of an automobile is a Fourth Amendment seizure." <u>Draper v. Upper Darby Twp. Police Dep't</u>, No. 10-cv-1080, 2012 WL 93178, at *2 (E.D. Pa. Jan. 11, 2012). "Police, may, however, exercise discretion to impound a vehicle [without a warrant] so long as that discretion is exercised according to standard criteria." <u>Id.</u> (citing <u>Colorado v. Bertine</u>, 479 U.S. 367, 375 (1987)). "The crux of whether the Fourth Amendment was violated depends on the objective reasonableness of the seizure." <u>Rosadao v. City of Coatesville</u>, No. 19-2426, 2020 WL 1508351, at *4 (E.D. Pa. March 30, 2020) (citing <u>United States v. Smith</u>, 522 F.3d 305, 312 (3d Cir. 2008)). The Third Circuit has emphasized that, "to satisfy the Fourth Amendment a community caretaking impoundment must be based on (1) a reasonable standard police procedure governing decisions on whether to impound vehicles and (2) the police must follow the procedure in the case involved." <u>Smith</u>, 522 F.3d at 314.

The City contends that Plaintiffs' Fourth Amendment claim is legally insufficient on two grounds. First, it asserts that "Plaintiffs together manifest several factual deficiencies which undermine their claim of unlawful seizure." (Def.'s Mem. Supp. Mot. to Dismiss 16.) It notes that the majority of Plaintiffs allege either that they were parked in locations that were not lawful parking spots (albeit temporarily) or in locations at which, even if signs were not visible by the time they returned, known utility construction or event-related road clearances occurred. <u>Id.</u> The City posits that a seizure is not unlawful if it is reasonable and consistent with the established statutory structure.[5]

---

[5]      The City relies on <u>Rosado v. Coatesville</u>, No. 19-cv-2426, 2020 WL 1508351 (E.D. Pa. Mar. 30, 2020). <u>Rosado</u>, however, is distinguishable. That case involved the Pennsylvania statutory scheme of towing all vehicles presumed to be abandoned. That statute defined abandoned vehicles as those left unattended on a highway or public property for more than 48 hours without a valid registration, a current certificate of inspection, or an ascertainable vehicle identification number. <u>Id.</u> at *4. Under the statutory scheme, after a vehicle is towed, but before it is finally declared abandoned, the vehicle owner must be notified of his right to a hearing, and all officers must complete an abandoned vehicle information

At the motion to dismiss stage, however, I must take the allegations of the Amended Complaint as true. Plaintiffs here allege that, at the time they parked their vehicles, the parking spots were legal, and most of the Plaintiffs contend that they had City-issued parking permits. Moreover, Plaintiffs allege that, at the time they parked, no "Temporary No Parking Signs" were posted, or they were posted in areas that were not near the cars. Indeed, several Plaintiffs contend that the "Temporary No Parking" signs were posted overnight, or shortly after they parked, such that the signs would not have provided notice. Finally, to the extent some Plaintiffs were aware of construction or events occurring nearby, no Plaintiffs claim to have been aware that parking was not permitted at the time they parked. Taking these allegations as true, I find that Plaintiffs have adequately pled a Fourth Amendment violation.

Second, The City reasserts that Plaintiffs have not alleged facts suggesting that their vehicles were towed by the City. However, as noted above, the Amended Complaint adequately pleads facts to suggest a policy by which vehicles were towed by the City or by other actors acting at the direction of the City. Plaintiffs have at minimum pled facts that could plausibly establish that their vehicles were towed pursuant to this policy As such, I decline to dismiss this claim.

    2.   Fourteenth Amendment Claim

"The [F]ourteenth [A]mendment prohibits state deprivations of life, liberty, or property without due process of law." Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984). "It is elementary that procedural due process is implicated . . . where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest." Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998). To survive a motion to dismiss a procedural due process claim, a plaintiff is required to plead facts supporting allegations that "(1) he was deprived of an individual interest that is encompassed within

---

report prior to the towing. Id. The Court found no Fourth Amendment violation because the seizure was objective reasonable and was performed according to standard criteria. Id. at *4–5.

    Here, by contrast, Plaintiffs allege a haphazard practice of courtesy towing vehicles, often to illegal spaces, and sometimes to tow lots. According to the Amended Complaint there is no standard practice of how long a space must be designated as Temporary No Parking before vehicles are towed, where vehicles are towed to, or how owners are notified of the tow. Accordingly, I find Rosado to be inapposite.

the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 233–34 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)). It has long been established that in the typical case, procedural due process requires "at a minimum," that the deprivation of a protected interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Goss v. Lopez, 419 U.S. 565, 579 (1975) (quotations omitted). However, in some circumstances, such as when the allegedly unlawful deprivation occurs through unauthorized action by state officials, a post-deprivation remedy will suffice to satisfy the mandate of procedural due process, even in the absence of a pre-deprivation remedy. See Hudson v. Palmer, 468 U.S. 517, 533 (1984).

The City posits that the Fourteenth Amendment claims must be dismissed because even though the PPD was unable to advise many of the Plaintiffs where their vehicles were towed, "all but two of the Plaintiff found their vehicles, either with the assistance of City or non-City employees or by walking around their neighborhoods. And those Plaintiffs who accumulated tickets in the new vehicle location were able to, albeit unsuccessfully, challenge the tickets through the structured process available to them." (Def.'s Mem. Supp. Mot. to Dismiss 19.)

The City's argument does not constitute grounds for dismissal under Rule 12(b)(6). Primarily, as noted above, it is "well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in terms of the Fourteenth Amendment." Fuentes v. Shevin, 407 U.S. 67, 85 (1972). Therefore, the fact that some Plaintiffs were able to locate their vehicles does not obviate the deprivation.

Moreover, The City has not established as a matter of law that adequate post-deprivation procedures existed. Although many of the Plaintiffs contacted PPD, the Amended Complaint asserts that PPD had no accurately-maintained log of which cars were towed, from where, and the location to which they were towed. Indeed, the PPD often merely advised Plaintiffs to just walk around the neighborhood, call private tow operators, or simply report their vehicles as stolen. As Plaintiffs note, this situation is

particularly egregious since the PPD has a database where it is supposed to enter all vehicle relocation information, but that database is not maintained. (Am. Compl. ¶¶ 86, 89, 91, 92.)

Finally, to the extent the City relies on the ability to appeal tickets and fines resulting from courtesy tows as adequate post-deprivation procedure, I also find that The City has not met its burden under Rule 12(b)(6). As noted above, in many cases, Plaintiffs allege that they had no meaningful way to appeal tickets because they had no written proof that their vehicles had been courtesy towed to illegal spots.[6]

In any event, none of these arguments allow me to find that Plaintiffs have failed to state a claim upon which relief may be granted. Rather, these issues are appropriately litigated after discovery. Accordingly, I will deny The City's Motion in its entirety. An appropriate order follows.

---

[6]     The City relies on <u>Shaheed v. City of Wilmington</u>, No. 21-cv-1333, 2022 WL 16948762 (D. Del. Nov. 15, 2022) for the principle that the process for appealing tickets and fines constitutes adequate post-deprivation notice. That case is inapposite. The plaintiff there argued that a car owner could not have a post-impoundment hearing unless he/she paid the disputed fines, towing, and storage fees under protest, and that this upfront payment requirement rendered the post-deprivation remedies unconstitutional. <u>Id.</u> at *6. The Court, however, found that requiring owners of impounded vehicles to pay their outstanding ticket fines and towing fees before they can have a hearing on the merits of their parking citations did not violate constitutional due process. <u>Id.</u> at *7. No one challenged the adequacy of the post-deprivation remedy.

Here, Plaintiffs do not contend that they are forced to pay tickets before appealing them. Rather, they argue that they have no adequate post-deprivation remedy because, due to the City's failure to maintain tow records, vehicle owners cannot prove that their cars were courtesy towed and, in turn, that the accrued tickets are improper.